Maurice JOHN, a Native American and member of the Seneca Nation of Indians, Plaintiff–Appellant,

v.

CITY OF SALAMANCA and Norris Stone, Defendants–Appellees.

No. 203, Docket 87–7404.

United States Court of Appeals, Second Circuit.

Argued Nov. 2, 1987.

Decided April 19, 1988.

---

Robert L. Pirtle, Seattle, Wash. (Kenneth W. Dehn, Pirtle, Morisset, Schlosser & Ayer, Seattle, Wash., Timothy O'Mara, Thomas J. Ryan, Jr., Williams, Stevens, McCarville & Frizzell, Buffalo, N.Y., of counsel), for plaintiff-appellant.

R. William Stephens, Buffalo, N.Y. (Raichle, Banning, Weiss & Stephens, Buffalo, N.Y., David M. Franz, Shane & Franz, Olean, N.Y., of counsel), for defendants-appellees.

William W. Taylor, III, Leslie A. Blackmon, Zuckerman, Spaeder, Goldstein, Taylor & Kolker, Washington, D.C., filed a brief for amicus curiae The Oneida Nation of Indians.

Douglas B.L. Endreson, Reid Peyton Chambers, Sonosky, Chambers & Sachse, Washington, D.C., filed a brief for amicus curiae The Seneca Nation of Indians.

Before PIERCE, WINTER and MINER, Circuit Judges.

MINER, Circuit Judge:

Plaintiff-appellant Maurice John appeals from a summary judgment entered in the United States District Court for the Western District of New York (Curtin, Ch. J.) in favor of defendants-appellees Norris Stone and the City of Salamanca. John, an enrolled member of the Seneca Nation of Indians, claims that, because his commercial property is located on Seneca Nation land, the City of Salamanca and its zoning code enforcement officer, Norris Stone, are without authority to compel John's compliance with the city's building code. We agree with the district court that federal law subjects John's property to regulation and affirm the grant of summary judgment.

## BACKGROUND

Maurice John is an enrolled member of the Seneca Nation of Indians. He owns a restaurant bearing his name in Salamanca, New York. According to the appellees, eighty-five percent of the City of Salamanca, including the site of John's establishment, lies within the Allegany reservation. This reservation land was set aside for the Seneca Nation by the United States government in the Treaty with the Six Nations, Nov. 11, 1794, 7 Stat. 44 (the "1794 Treaty"). Through various agreements negotiated in the latter half of the nineteenth century, the Seneca Indians leased reservation land to settlers and rail companies. *See United States v. Forness*, 125 F.2d 928, 930–31 (2d Cir.), *cert. denied sub nom. City of Salamanca v. United States*, 316 U.S. 694, 62 S.Ct. 1293, 86 L.Ed. 1764

(1942). These leases subsequently were ratified by Congress, and villages that had been established unofficially on the leased land were recognized. *See* Act of Feb. 19, 1875, ch. 90, 18 Stat. 330 (the "1875 Act"). The villages of Salamanca and West Salamanca, which merged to become the City of Salamanca in 1913, were among the villages recognized in the 1875 Act.

In 1986, John began renovating his restaurant premises without first applying for a building permit and filing his plans with Salamanca's zoning commissioner, appellee Stone, in violation of Salamanca Municipal Ordinance § 26.31. As a consequence, appellant was served with notices of violation and stop orders, the last of which was served on June 27, 1986.[1] Following the commencement of this action, John applied for a temporary restraining order and preliminary injunction, alleging that the defendants were without authority to enforce the building code against him and that their attempts to enforce it constituted harassment. In his complaint, he requested damages and permanent injunctive relief.

Appellees opposed John's motion and moved for summary judgment, supported by the affidavits of Stone, numerous city officials and others attesting to the past compliance with the city's building code by members of the Seneca Nation. Additionally, appellees contended that the city's enforcement of its building code was authorized by federal law. In particular, they claimed that Congress expressly granted the State of New York jurisdiction over the Seneca Nation in the 1875 Act and in 25 U.S.C. § 233,[2] which extended the civil jurisdiction of the state courts over the Seneca Indians.

In opposition to the motion for summary judgment, John submitted his own affidavit, arguing that the Seneca Nation owned the Allegany reservation and that the city's attempt to enforce its ordinances was an unauthorized infringement of the Seneca Nation's sovereignty. John presented no evidence to rebut the city's factual submissions concerning past compliance with the building code, although he did claim that the affidavits offered were "self-serving."

Chief Judge Curtin granted the motion for summary judgment. He held that section 233 was an explicit grant to New York State of civil jurisdiction over the Seneca Indians. Since the Salamanca building code was enacted pursuant to authority delegated by the state, *see* N.Y.Exec.Law § 374–a (McKinney 1982), the Judge concluded that the code had the effect of state law. Thus, as a matter of law, John was subject to the code pursuant to section 233.

On appeal, John attacks the district court's decision on several grounds. He argues that the city's ordinances are preempted by the 1794 Treaty, which guarantees the Seneca Indians "free use and enjoyment" of the reservation lands, *see* 1794 Treaty, art. III, 7 Stat. at 45. He also bottoms his challenge on the principle that, absent congressional action conferring regulatory power, state and local governments are without authority to enforce zoning and building codes on Indian reservations. *See Santa Rosa Band of Indians v. Kings County,* 532 F.2d 655 (9th Cir.1975), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 731, 50 L.Ed.2d 748 (1977). John claims that section 233 is not, as the district court found, such a grant of authority.

---

**1.** On July 7, 1986, after the complaint in this action was filed, John was served with an "Order to Remedy Violation" for his failure to comply with Salamanca Municipal Ordinance § 30.62 in connection with the installation of a sign on the facade of his premises. Section 30.62 regulates the erection of exterior signs on buildings within the city, and requires a sign permit before erection can commence. Salamanca Mun. Ord. § 30.62. John also challenges enforcement of this provision of the Salamanca building code.

**2.** Section 233 provides in pertinent part:

The courts of the State of New York under the laws of such State shall have jurisdiction in civil actions and proceedings between Indians or between one or more Indians and any other person or persons to the same extent as the courts of the State shall have jurisdiction in other civil actions and proceedings, as now or hereafter defined by the laws of such State....

25 U.S.C. § 233 (1982).

John asserts that federal law places the power to oversee the Allegany reservation in the Secretary of the Interior and that the Secretary's regulation, 25 C.F.R. § 1.4 (1987), explicitly prohibits enforcement of state and local zoning and use restrictions on the reservation. He argues that enforcement of the city's code is an affront to the sovereignty of the Seneca Nation. Finally, he disputes the contention, urged by appellees, that the 1875 Act extends municipal law to the leased land.

We conclude that the 1875 Act, as interpreted by this Court in *Forness*, controls the instant dispute.

## DISCUSSION

The Supreme Court has recognized that Indian "tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States." *Washington v. Confederated Tribes*, 447 U.S. 134, 154, 100 S.Ct. 2069, 2081, 65 L.Ed.2d 10 (1980); *see also* Note, *Tribal Sovereign Immunity: Searching For Sensible Limits*, 88 Colum.L.Rev. 173, 178 (1988) (under the Constitution, Congress has plenary authority over Indians). Nevertheless, a state may apply its law to Indians living on reservations within its borders "if Congress has expressly so provided." *California v. Cabazon Band of Indians*, 480 U.S. 202, 107 S.Ct. 1083, 1087, 94 L.Ed.2d 244 (1987). We must determine whether the 1875 Act is such an express congressional grant of regulatory authority.

The 1875 Act formally recognizes those villages that already were established on the leased Allegany reservation land and extends the reach of "municipal laws" to those villages. *Forness*, 125 F.2d at 932. Section 8 of the 1875 Act provides:

That all laws of the State of New York now in force concerning the laying out,

altering, discontinuing, and repairing highways and bridges shall be in force within said villages, and may, with the consent of said Seneca Nation in council, extend to, and be in force beyond, said villages in said reservations, or in either of them; and all municipal laws and regulations of said State may extend over and be in force within said villages: *Provided, nevertheless,* That nothing in this section shall be construed to authorize the taxation of any Indian, or the property of any Indian not a citizen of the United States.

18 Stat. at 331 (emphasis in original). In *Forness*, this court held that the words " '[m]unicipal laws' of such a state can have but one referent, i.e., the laws of [New York State's] municipalities." *Forness*, 125 F.2d at 932. We find that section 8, as interpreted in *Forness*, expresses Congress' intention to extend ordinances, such as those Salamanca wishes to enforce against John, to the leased land.

■ At the outset, we address John's contention that the ordinances are state, not municipal, laws. John asserts that the ordinances simply enforce state law regulating building standards, and that this alters the local nature of the city's enactments. The City of Salamanca, like many of New York's municipalities, has elected to adopt and enforce the state's building code within its territorial limits. *See* N.Y. Exec.Law § 374–a (McKinney 1982). However, under this scheme, the municipality functions as more than a mere conduit for state regulation. Enforcement of the state building code is the municipality's responsibility, and all laws concerning "approval or disapproval of plans and specifications" and "the issuance and revocation of building permits" are to be adopted at the local level. N.Y.Exec.Law § 383.[3] The Salamanca municipal ordinances at issue are

---

**3.** *See* N.Y.Comp.Codes R. & Regs. tit. 9, pt. 444. This state regulation requires cities adopting the state building code to provide for "administration and enforcement" of the code. *Id.* at § 444.2. The regulation also sets forth specific requirements for building permits, frequency of inspections and maintenance of records. *Id.* at § 444.3. The municipalities comply with the regulation by enacting laws at the local level.

*Id.* at § 444.2. Thus, although appellees purport to seek · enforcement of the state regulation, Brief for Appellees at 9 n. *, they have fulfilled that responsibility by enacting and enforcing the municipal ordinances at issue. The ordinances' "municipal" character is not altered merely because they have been adopted pursuant to state regulation.

part of this enforcement mechanism. We conclude, therefore, that the ordinances are municipal—not state—laws.

■ Of course, identifying the ordinances as "municipal laws" cannot resolve fully the instant dispute, for the parties disagree on the definition of those words as Congress used them in section 8. John urges us to adopt the view of the district court in *Forness* that "the words 'municipal laws' were intended to apply only to the State laws for the government and control of villages," *United States v. Forness*, 37 F.Supp. 337, 341 (W.D.N.Y.1941). We decline to accept this construction, since it plainly is inconsistent with our own observation in *Forness* that the word "municipal" has the same meaning "as when we speak of the 'Municipal Building' of the City of New York," 125 F.2d at 932.

John assails as "illogical" the "City's claim that the language in question means that the villages' ordinances apply to Indians." He argues that the power of a state to enforce its criminal laws, even against non-Indians, on reservation land was not recognized until the Supreme Court's decision in *United States v. McBratney*, 104 U.S. (14 Otto) 621, 26 L.Ed. 869 (1882). Thus, John contends that under the law at the time the 1875 Act was passed "New York State law had no authority over non-Indians on the Reservation, [and therefore] the municipal governments of the villages purportedly formed pursuant to New York State laws were arguably invalid and without authority to govern." Appellant concludes that the 1875 Act was passed solely to "validate the leases and confirm the formation of lawful village governments."

The argument is flawed. John ignores the Supreme Court's decision in *New York v. Dibble*, 62 U.S. (21 How.) 366, 16 L.Ed. 149 (1859), which recognized the sovereign power of New York State over the Seneca's "persons and property, so far as it was necessary to preserve the peace of the Commonwealth," and the state's authority to enforce, on the reservations, laws respecting trespass by non-Indians on Indian land. *Id.* 62 U.S. (21 How.) at 370. Therefore, the Supreme Court's holding in *McBratney* was, to some extent, presaged by *Dibble*.

Additionally, appellant's construction of the 1875 Act would lead to an absurd result. John contends that Congress' sole purpose in adopting the disputed language was to proclaim the power of New York State to create villages with "lawful" governments, and that it never intended to guarantee that the laws enacted by those governments would be in force on the leased land. John's reading denies the villages a fundamental characteristic of government: the power to regulate the land within their territorial limits. Thus, appellant suggests that Congress intended to establish the villages' *authority* to govern while denying them the *ability* to do so. We cannot adopt this tortured reading of Congress' language.

Appellant also claims that the appellees' construction of section 8 "would create a topsy turvy jurisdictional scheme which Congress could not have intended." Referring to our determination in *Forness* that the laws of New York State did not extend to the leased land, John suggests that, under our interpretation of the 1875 Act, Congress provided for the enforcement of village laws, but not state laws, on the leased land. In fact, in *Forness* we held that Congress had created just such a jurisdictional scheme; the *Forness* court concluded that only the laws of New York's municipalities extended to the leaseholds, to the exclusion of state laws governing the relations of lessors and lessees. *Forness*, 125 F.2d at 932.[4]

John asserts that the language of section 8 is ambiguous because the parties disagree over its construction. While we rec-

---

**4.** Federal statutes now provide for the application of various state laws on Indian reservations in New York. *See* 25 U.S.C. §§ 232–33. Section 232, passed in 1948, extends the State of New York's criminal jurisdiction to "offenses committed by or against Indians on Indian reserva-

tions within the [state]." Section 233, passed two years later, grants the New York courts jurisdiction to hear civil disputes "between Indians or between one or more Indians and any other person or persons" with certain exceptions.

ognize that ambiguities in federal laws dealing with the Indians should be resolved in their favor, *Bryan v. Itasca County*, 426 U.S. 373, 392, 96 S.Ct. 2102, 2112–13, 48 L.Ed.2d 710 (1976), we need not resort to this canon of construction to resolve the instant dispute. The meaning of the statute is abundantly clear, especially in light of *Forness*, and it leads us to conclude, as we did in that case, that the words "municipal laws" in the 1875 Act refer to the laws of New York State's municipalities.

■ Conceding *arguendo* that municipal laws like the Salamanca ordinances were meant to extend to the leased land, John argues nevertheless that Congress could not have intended that such laws apply to Indians living there. According to appellant, at the time that Congress passed the 1875 Act, few, if any, Indians lived on the leaseholds, indicating that Congress never anticipated the result we reach today.

Even assuming the accuracy of appellant's claim as to the demography of the leased land, we cannot agree with the conclusion he has drawn. Section 8 expressly exempts the persons and property of the Indians from taxation, 18 Stat. at 331, suggesting that Congress recognized the possibility that the laws of the villages would apply to Indians as well. We conclude that Congress anticipated a change in the demography of the leased land, and that, with the exception of taxation, Congress authorized municipalities to enforce their laws against Indians living within the villages.

■ Appellant and the *amici curiae* claim that subjecting John to Salamanca's ordinances necessarily trammels the Seneca Nation's tribal sovereignty and its right to govern. While Indian tribes retain certain attributes of sovereignty, their power to govern has been circumscribed over the years. *United States v. Wheeler*, 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978). Indian tribal sovereignty is of "a unique and limited character. It exists only at the sufferance of Congress," *id.;* see *Confederated Tribes*, 447 U.S. at 152, 100 S.Ct. at 2081 (tribes retain sovereignty "unless divested of it by federal law"); *cf. Knight v. Shoshone & Arapahoe Indian Tribes*, 670 F.2d 900, 902 (10th Cir.1982)

(tribe has inherent power to regulate use by non-Indians of reservation land as long as "Congress has not acted to delegate or deny [that] right"). While the Supreme Court has noted that a tribe does not abandon its sovereignty over land simply by leasing it to non-Indians, *see Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 146, 102 S.Ct. 894, 906, 71 L.Ed.2d 21 (1982), the precise scope of tribal power over leased land nonetheless is subject to limitation by Congress, *id.* at 149, 102 S.Ct. at 908.

We conclude that Congress limited the sovereignty of the Seneca Nation over the reservation land within the City of Salamanca. The plain language of the 1875 Act supports this conclusion. In section 8 of the Act, Congress provided that state laws governing the construction and maintenance of bridges and highways could be enforced within the reservation, but only with the consent of the Seneca Nation in council. *See* 18 Stat. at 331. No consent was required for the enforcement of those laws within the villages. *See id.* Similarly, enforcement of municipal laws within the villages was not predicated on the consent of the Seneca Nation. *See id.* Therefore, we believe that in section 8 Congress clearly defined the limits of the Seneca Nation's sovereign authority over the leased land. The 1875 Act distinguishes between the villages and the remainder of the reservation, and indicates that the Seneca Nation retained authority over the latter, but not the former.

We find John's argument based on the 1794 Treaty inapposite. The 1875 Act did not disturb the Seneca Nation's rights to free use and enjoyment of the leased land. Congress merely ratified leases executed by members of the tribe. These leases were voluntary conveyances of rights to present use and possession. Therefore, by their own actions the Indians diminished their enjoyment of the leased land. Under the leases, future rights of occupancy, granted in the 1794 Treaty, remain secure, subject only to the expiration of the lease terms. However, in the interim, the Indians cannot treat the leaseholds as they would other portions of the reservation. Their "free use" necessarily is limited by the rights of those in possession.

The fact that John, a member of the tribe, now possesses rights in the leased land as an individual does not change the result. The treaty defines an estate, of sorts, in land. It does not purport to cloak individual tribal members with immunity from governmental regulation. Therefore, having recognized that the Seneca Nation's present rights in the leased land are diminished, we do not find it inconsistent with the 1794 Treaty to recognize the application of municipal law to a portion of that land regardless of the identity of its possessor.

In sum, we find that the 1875 Act extends municipal laws to the leased reservation land within Salamanca's territorial limits. Because the Salamanca ordinances are municipal laws, the 1875 Act, not 25 U.S.C. § 233, is the source of Salamanca's authority to enforce them. Therefore, we need not reach the issue whether section 233 expanded the state's regulatory jurisdiction over the Seneca Nation.[5] Thus, we do not adopt Judge Curtin's reasoning, but nevertheless agree with the result he reached.

### CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.

---

5. Nor do we consider the Secretary of the Interior's regulation, 25 CFR § 1.4, controlling in this case. We are unaware of any authority delegated to the Secretary, and John has cited none, which would empower him effectively to repeal congressional legislation. The 1875 Act must take precedence over the regulation in the absence of a clear expression of congressional intent to the contrary.