Joseph FLUENT, Individually and as a representative of the Class of Salamanca Lessees holding 99–year leases from Seneca Nation of Indians; James V. Mongillo, Individually and as a representative of the class of Salamanca lessees holding 50–year leases from the Seneca Nation of Indians and Keith McClain, Individually and as a representative of the class of congressional village lessees holding 99–year leases from the Seneca Nation of Indians; Robert Adamic, Individually and on behalf of the class of lessees who signed the "40/40 Lease" Tendered by the Seneca Nation of Indians on or about September 4, 1990; Marilyn Adamic, Individually and on behalf of the class of lessees who signed the "40/40 Lease" Tendered by the Seneca Nation of Indians on or about September 4, 1990; Salamanca Coalition of United Taxpayers, Inc., Individually and on behalf of its membership, Plaintiffs–Appellants,

v.

SALAMANCA INDIAN LEASE AUTHORITY; David Franz, Individually and as Attorney for the City of Salamanca Indian Lease Authority; Antonio Carbone, Individually and as Mayor of the City of Salamanca and also as member of the Salamanca Indian Lease Authority; City of Salamanca; Patrick Callaghan, Individually and as Chairman of the Salamanca Indian Lease Authority; Linda Rychcik, Individually and as a member of the Salamanca Indian Lease Authority; Henry Stefanski, Individually and as a member of the Salamanca Indian Lease Authority; Owen K. Phillips, Individually and as a member of the Salamanca Indian Lease Authority; Dann Colvin, Individually and as a member of the Salamanca Indian Lease Authority; Paul Taylor; Penny Buckley; Seneca Nation of Indians, Defendants–Appellees.

No. 1300, Docket 91–7086.

United States Court of Appeals, Second Circuit.

Argued Feb. 19, 1991.
Decided March 15, 1991.

Jennifer A. Coleman (Iris B. Schifeling, Damon & Morey, Buffalo, N.Y., of counsel), for plaintiffs-appellants.

Douglas B.L. Endreson, Washington, D.C. (Reid Peyton Chambers, Sonosky, Chambers, Sachse & Endreson, Washington, D.C., Michael Brady, Hagerty & Brady, Buffalo, N.Y., of counsel), for defendant-appellee Seneca Nation of Indians.

R. William Stephens (David M. Franz, Raichle, Banning, Weiss & Stephens, Buffalo, N.Y., of counsel), for defendants-appellees other than Seneca Nation of Indians.

Before FEINBERG, TIMBERS and MINER, Circuit Judges.

MINER, Circuit Judge:

Plaintiffs–Appellants Salamanca Coalition of United Taxpayers, Inc. ("SCOUT"), representing nearly 600 lessees, and five individual lessees (collectively "Appellants") commenced this action against their lessors, the Seneca Nation of Indians ("Nation"), and against the Salamanca Indian Lease Authority ("SILA"), the City of Salamanca ("City") and various City officials to compel the Nation to renew their leases for up to 99 years. Other relief was sought, including a declaration that the agreement negotiated by SILA, the City and the Nation for renewal of the leases was null and void. The Appellants also challenged the constitutionality of the Seneca Nation Settlement Act of 1990, by which Congress approved the agreement for renewal of the leases and appropriated $35 million toward the rental payments. The district court dismissed all claims against the Nation, finding that the Nation was immune from suit. It also dismissed two claims against the remaining defendants on the ground that an adjudication of those claims in the absence of the Nation would impede the Nation's ability to protect its interest in the subject of those claims. We hold that the district court correctly found that the Nation was immune from suit under the doctrine of sovereign immunity and properly dismissed the other two claims against the remaining defendants under Fed.R.Civ.P. 19.

## BACKGROUND

The dispute giving rise to this action involves the renewal of leases to tribal lands within the City and outlying villages, known as the Congressional Villages. The tribal lands were leased by the Nation in the mid-nineteenth century to various settlers and railroads. The leases were validated by Congress in the Act of February 19, 1875, ch. 90, 18 Stat. 330 ("1875 Act"). When they were about to expire, the leases were renewed in accordance with the terms of the 1875 Act, first in 1880 for a 12–year term, then in 1892 for a 99–year term, *see* Act of September 30, 1890, ch. 1132, 26 Stat. 558 ("1890 Act") (amending the 1875 Act and authorizing 99–year renewal term). The leases subject of this action all expired on February 19, 1991.[1]

SILA was formed in 1969 pursuant to New York legislation authorizing it to negotiate a master lease with the Nation for all reservation lands located within the City and the surrounding villages. N.Y.Pub. Auth.Law §§ 1790–99 (McKinney 1981 & Supp.1991). The Nation refused to negotiate a master lease, preferring instead to negotiate individual leases with each lessee. SILA then sought and received authorization from an overwhelming majority of lessees, whose leases were about to expire, to negotiate on their behalf. Over the course of some twenty years, SILA, the City and the Nation endeavored to negotiate an agreement to renew the leases. In mid-July, 1990, the parties signed a renewal agreement ("Agreement"). That Agreement provided for leases with a forty-year rental term and a right to renew for an additional forty years ("40/40 leases"). Rents were based on the fair market value of the land rather than on the value of the land and the improvements. The Nation originally had requested rentals based on the value of the land as improved in light of the "unconscionably" low rent it had received during the past 99 years. *See United States v. Forness*, 125 F.2d 928,

941 (2d Cir.), *cert. denied*, 316 U.S. 694, 62 S.Ct. 1293, 86 L.Ed. 1764 (1942). One of the conditions of the Agreement was payment by the federal government and New York State of monies approximating the difference between the fair market rental value and the rents actually received by the Nation over the past 99 years. Congress enacted the Seneca Nation Settlement Act of 1990, Pub.L. No. 101–503, 104 Stat. 1292 ("1990 Act"), in which it agreed to pay approximately $35 million. 1990 Act, § 6, 104 Stat. at 1295–96. Apparently, New York State has agreed to pay $25 million, and, according to the Nation, legislation appropriating that amount is anticipated shortly. The total annual rental payment due from the lessees themselves on the new leases was set at $800,000, to be collected and paid by the City. That amount is subject to adjustment based on a yearly reappraisal of individual land values. Each lessee is responsible for an annual rent equal to eight percent of land value, if the property is leased for residential purposes, and ten percent of land value, if the property is leased for nonresidential purposes.

After reviewing the Agreement and the 40/40 leases, the Appellants notified the Nation that they were dissatisfied and would institute a lawsuit. On November 30, 1990, the Appellants commenced this action. In the first cause of action in their complaint, they sought a declaration that they are entitled to a renewal of up to 99 years in accordance with the Acts of 1875 and 1890 and the terms of their expired leases. They also claimed in the first cause of action that section 3 of the 1875 Act and the terms of their expired leases entitle them to arbitration for a determination of fair rent. In the eighth cause of action, asserting that SILA lacked authority to negotiate an agreement for the renewal of leases on their behalf, the Appellants sought a declaration that the Agreement was null and void. Additionally, in the tenth cause of action, the Appellants chal-

---

1. In 1939, many of the leases were cancelled by the Nation for failure to pay rent. *See United States v. Forness*, 125 F.2d 928 (2d Cir.), *cert. denied*, 316 U.S. 694, 62 S.Ct. 1293, 86 L.Ed. 1764 (1942). The Nation offered new leases to

the lessees whose leases were cancelled, and those leases, the longest of which had a term of forty-nine years, also expired on February 19, 1991. Some of the original leases expire at various times from about 2029 and 2034.

lenged the constitutionality of the 1990 Act. The Nation moved to dismiss all claims against it on the ground of sovereign immunity and moved to dismiss the eighth and tenth causes of action against the other defendants on the ground that it was an indispensable party as to those two causes of action. *See* Fed.R.Civ.P. 19(b). On January 25, 1991, the district court granted the motion and dismissed all claims pleaded against the Nation and also dismissed the eighth and tenth causes of action set forth in the complaint.

The district court concluded that the Nation is immune from suit under the doctrine of sovereign immunity because the 1875 Act did not waive in unequivocal terms the Nation's sovereign immunity. Finding that any declaration that the Agreement was void would greatly affect the interests of the Nation as a party to that Agreement, the court dismissed the eighth cause of action also. Finally, because the 1990 Act authorizes the payment of a substantial sum of money to the Nation, the court found that a constitutional challenge to the 1990 Act, the tenth cause of action, could not be adjudicated in the absence of the Nation without impairing the Nation's ability to protect its interest in the receipt of those funds. The court entered its order as a final judgment against the Nation under Fed.R.Civ.P. 54(b) because of the imminent expiration of the leases. This appeal followed.

### DISCUSSION

The Appellants contend that the district court erred by dismissing the claims against the Nation on the ground of sovereign immunity, primarily because section 7 of the 1875 Act provides for jurisdiction over claims regarding the possession of leased property. They point to actions enumerated by the Act over which the court "shall have jurisdiction." Section 7 provides in material part

> [t]hat the ... circuit and district courts of the United States in and for the northern [now western] district of [New York], shall have jurisdiction of all actions for the recovery of rents and for

the recovery of possession of any real property within the limits of said villages, whether actions of debt, ejectment, or other forms of action, according to the practice in said courts; and actions of forcible entry and detainer, or of unlawful detainer arising in said villages, may be maintained in any of the courts of said county which have jurisdiction of such actions.

The Appellants interpret this provision as authorizing actions by both lessors and lessees. Likewise, they point to section 3 of the 1875 Act, which provides that persons who are the "owners of improvements erected upon such lands, shall be entitled to such renewed leases, and to continue in possession of such lands," to support their contention that, since lessees are entitled to possession upon renewal, Congress intended to waive the Nation's immunity and to provide a forum for the resolution of disputes pertaining to possession. We disagree with Appellants' construction of the statute.

"Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978); *see Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, —— U.S. ——, 111 S.Ct. 905, 908, 112 L.Ed.2d 1112 (1991). However, tribal sovereignty is subject to Congress' plenary control, and thus "Congress [is] always ... at liberty to dispense with ... tribal immunity or to limit it." *Id.*, 111 S.Ct. at 910; *see, e.g., Martinez*, 436 U.S. at 58, 98 S.Ct. at 1677; *United States v. United States Fidelity & Guaranty Co.*, 309 U.S. 506, 512, 60 S.Ct. 653, 656, 84 L.Ed. 894 (1940); *Turner v. United States*, 248 U.S. 354, 358, 39 S.Ct. 109, 110, 63 L.Ed. 291 (1919); *John v. City of Salamanca*, 845 F.2d 37, 40 (2d Cir.), *cert. denied*, 488 U.S. 850, 109 S.Ct. 133, 102 L.Ed.2d 106 (1988). It has long been the rule that waiver of tribal immunity cannot be implied but rather must be "unequivocally expressed." *Martinez*, 436 U.S. at 58–59, 98 S.Ct. at 1677 (citations omitted). We agree with the district court that section 7 fails to

unambiguously express Congress' intent to subject the Nation to lawsuits concerning disputes over the lease of tribal lands. *See United States v. Charles*, 23 F.Supp. 346, 348–49 (W.D.N.Y.1938) (action to set aside deed held barred by sovereign immunity of the Seneca Nation of Indians).

Section 7 enumerates actions typically brought by lessors, including actions for the recovery of rents and of possession of real property and actions for debt, ejectment, forcible entry and detainer and unlawful detainer. Each enumerated action provides a remedy for the Nation against defaulting lessees. The fact that only a strained reading of the statute might permit specific forms of actions to be brought by tenants against their landlords serves to underscore the absence of a clear expression of a waiver of the kind urged by the Appellants. *Cf. Dellmuth v. Muth*, 491 U.S. 223, 109 S.Ct. 2397, 2401, 105 L.Ed.2d 181 (1989). When Congress has chosen to limit or waive the sovereign immunity of Indian tribes, it has done so in clear language. *See, e.g.*, Act of July 22, 1958, Pub.L. No. 85–547, § 1, 72 Stat. 403, 403 (authorizing Navajo and Hopi tribes "to commence or defend ... an action against each other"); Act of December 22, 1974, Pub.L. No. 93–531, § 8(a), 88 Stat. 1712, 1715 (Either the Navajo or Hopi "tribe[ ] is ... hereby authorized to commence or defend ... an action against the other tribe."). Because a congressional waiver was not "unequivocally expressed," we may not hold that the statute relied upon by the Appellants waives the sovereign immunity of the Nation. *See Martinez*, 436 U.S. at 58–59, 98 S.Ct. at 1677.

■ Regarding the Appellants' contention that the legislative history supports their position that Congress intended to provide a forum for all lease disputes, the need to resort to legislative history similarly highlights the deficiency of the Appellants' position. "If Congress' intention is 'unmistakably clear in the language of the statute,' recourse to legislative history will be unnecessary; if Congress' intention is not unmistakably clear, recourse to legislative history will be futile." *Dellmuth*, 109

S.Ct. at 2401. Nevertheless, we think the legislative history clearly demonstrates that Congress never intended to waive the immunity of the Nation. The following remarks of Senator Ingalls, a proponent of the bill, indicate the basic purpose of the 1875 Act: "[The 1875 Act] simply proposes that the leases which have been made by these Indians themselves, by their own consent, shall be ratified and confirmed, and held to be valid and binding upon the parties who have voluntarily made these contracts." 3 Cong.Rec. 909–10 (1875). The legislation was proposed in light of a decision by the New York State Supreme Court, in which the court found the leases to be invalid because they were executed without the authorization of the United States. *See Forness*, 125 F.2d at 930–31 & n. 1. Thus, the overriding purpose of the 1875 Act was to validate the existing leases voluntarily entered into between the Nation and the settlers.

Even assuming we were to agree with the Appellants' contention that the 1875 Act unmistakably and clearly waives the immunity of the Nation, we would affirm the district court's judgment on the ground that the renewal provisions of 1875 Act applied only to the original renewals and do not extend to the present renewals. Section 3 of the 1875 Act validated leases existing at that time for a five-year term and authorized a term of renewal "not exceeding twelve years." The 1875 Act also provided that "whenever any lease shall expire after its renewal ..., it may, at the option of the lessee, his heirs or assigns, be renewed in the manner hereinbefore provided." The 1890 Act amended the 1875 Act to allow renewal for "a term not exceeding ninety-nine years, instead of the term of twelve years." Thus, the leases that expired on February 19, 1991 are leases that previously were renewed a second time for a term of 99 years. The 1875 Act does not authorize a perpetual renewal, and without clear language to that effect, we will not construe the statute to confer such a right. *See Winslow v. Baltimore & Ohio R.R. Co.*, 188 U.S. 646, 654–55, 23 S.Ct. 443, 446, 47 L.Ed. 635 (1903) (plain language necessary to establish intent to

provide right of perpetual renewal); *McLean v. United States*, 316 F.Supp. 827, 829 (E.D.Va.1970) ("[t]he intent to create a perpetual lease must appear in clear and unequivocal language"); *McMillan v. Malvern Gravel Co.*, 136 F.Supp. 567, 574 (W.D.Ark.1955) (same); 50 Am.Jur.2d *Landlord & Tenant* § 1171 (1970).

The Appellants contend that the 1875 Act "stands ready to resolve this lease dispute in a fair and equitable way. It provides for renewal and then negotiation or binding arbitration for the rent and conditions of the renewal lease." Undoubtedly, the 1875 Act provided for the validation of leases and for arbitration in the event the parties could not agree to the terms of the renewal leases. The Appellants, however, already benefitted from the renewal and arbitration procedures set forth in the 1875 Act, first in 1880 and then in 1892. That is all the statute requires.

■ Nor do the terms of the expired leases provide that the Nation must accede to the Appellants' proposals for renewal. The expired leases allow for the parties to agree on terms of renewal. The Nation did not agree to a 99–year term of renewal. Instead, it agreed, along with the City and SILA, which represents about two thousand lessees, to a forty-year rental term with a forty-year right to renew. The 40/40 leases provide that disputes "concerning any party's compliance with or obligations under any of the terms" of the lease can be submitted to arbitration. The new leases satisfy the requirements of the statute and the expired leases in that they represent an agreement by the parties.

■ The Appellants' contention, that tribal immunity does not bar federal jurisdiction when no other forum is available for the resolution of claims, must fail. The lack of a forum does not automatically prevent dismissal of the claims asserted. *Makah Indian Tribe v. Verity*, 910 F.2d 555, 560 (9th Cir.1990). "Sovereign immunity may leave a party with no forum for [that party's] claims." *Id.* (citing *Lomayaktewa v. Hathaway*, 520 F.2d 1324, 1326 (9th Cir.1975), *cert. denied*, 425 U.S. 903, 96 S.Ct. 1492, 47 L.Ed.2d 752 (1976)). The only branch with the ability to provide a forum for resolution of the issues involved here is Congress. Without a clear congressional mandate, however, we cannot grant the relief sought by Appellants.

■ The argument that the court erred in dismissing from the complaint claims in which the Appellants sought a judicial declaration that the Agreement was null and void and that the 1990 Act was unconstitutional is without any merit. The Nation moved to dismiss these claims (the eighth and tenth causes of action) pleaded against it and the remaining defendants, pursuant to Fed.R.Civ.P. 19(b). After engaging in the analysis required by Fed.R.Civ.P. 19(a), the district court concluded that any resolution of those particular claims would, as a practical matter, both impair and impede the Nation's ability to protect its interest in the Agreement and in receipt of funds authorized by the 1990 Act.

There can be no doubt that the Nation qualifies under rule 19(a) as an indispensable party to these claims. As a party to an Agreement negotiated for over two decades, the Nation's interest in the validity of the lease agreement is significant. *See Crouse–Hinds Co. v. InterNorth, Inc.*, 634 F.2d 690, 701 (2d Cir.1980) (citing *Lomayaktewa*, 520 F.2d at 1325 ("[n]o procedural principle is more deeply imbedded in the common law than that, in an action to set aside a lease or a contract, all parties who may be affected by the determination of the action are indispensable")); *McClendon v. United States*, 885 F.2d 627, 633 (9th Cir.1989) (same). Additionally, as the beneficiary of a substantial sum of money from the federal government, it is manifest that the Nation has a vital interest in the constitutionality of the 1990 Act.

■ After determining that joinder under rule 19(a), while desirable, was not feasible because of the tribe's sovereign immunity, the district court considered the rule 19(b) factors. "[T]he [r]ule allows courts ... to determine the emphasis to be placed on each consideration according to 'the facts of [the] given case and in light of

**548**

the governing equity-and-good-conscience test.'" *Associated Dry Goods Corp. v. Towers Financial Corp.*, 920 F.2d 1121, 1124 (2d Cir.1990) (quoting 7 C. Wright & A. Miller, Federal Practice & Procedure § 1608, at 91–92). It has been held that when an indispensable party is "immune from suit, 'there is very little room for balancing of other factors' set out in [r]ule 19(b), because immunity ' "may be viewed as one of those interests 'compelling by themselves.'" ' " *Enterprise Mgmt. Consultants, Inc. v. United States ex rel. Hodel*, 883 F.2d 890, 894 (10th Cir.1989) (quoting *Wichita & Affiliated Tribes of Oklahoma v. Hodel*, 788 F.2d 765, 777 n. 13 (D.C.Cir.1986) (quoting 3A Moore's Federal Practice ¶ 19.15, at 19–266 n. 6 (1984))); *see Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 119, 88 S.Ct. 733, 743, 19 L.Ed.2d 936 (1968). The rationale behind the emphasis placed on immunity in the weighing of rule 19(b) factors is that the case is not one "where some procedural defect such as venue precludes litigation of the case. Rather, the dismissal turns on the fact that society has consciously opted to shield Indian tribes from suit without congressional or tribal consent." *Wichita*, 788 F.2d at 777. After recognizing the "paramount importance accorded the doctrine of sovereign immunity under [r]ule 19," the district court found that the eighth and tenth causes of action should not be adjudicated in the absence of the Nation. We agree and hold that the district court did not abuse its discretion in dismissing the eighth and tenth causes of action.

## CONCLUSION

The judgment of the district court dismissing the claims against the Nation and dismissing the first, eighth and tenth causes of action of the complaint is affirmed. Our order of February 14, 1991 directing that the status quo be maintained pending further order of the court is rescinded.