**Gregory T. BANNER, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 96–708L.**

United States Court of Federal Claims.

Aug. 11, 1999.

Jennifer A. Coleman, Buffalo, NY, for plaintiff.

Margaret M. Sweeney, Washington, DC, with whom was David Moran, of counsel, for defendant.

## ORDER

TIDWELL, Senior Judge.

A group of individuals and the Salamanca Coalition of United Taxpayers ("SCOUT"), who once leased portions of the Allegany Reservation in upstate New York, bring this Fifth Amendment takings and due process action. Plaintiffs contend that a 1990 congressional statute—the Seneca Nation Land Claims Settlement Act, 25 U.S.C. § 1774 (1994) (hereinafter "Act of 1990")—extin-

guished plaintiffs' leasehold renewal rights and unlawfully transferred plaintiffs' ownership interest in improvements on the land to the Seneca Nation of Indians ("SNI"). Now before this court are defendant's motion to dismiss or, in the alternative, motion for summary judgment; plaintiffs' cross-motion for summary judgment and motion to strike the declaration of William A. Morgan; and defendant's cross-motion to strike, in part, the declaration of Jennifer A. Coleman. For the reasons set forth below, defendant's motion to dismiss the due process claim is *ALLOWED,* defendant's motion for summary judgment on the takings claim is *ALLOWED,* and plaintiffs' cross-motion for summary judgment is *DENIED.* Both plaintiffs' and defendant's motions to strike, which this court need not consider, are *DENIED.*

## FACTS

### I. Historical Background

In the mid-nineteenth century, SNI granted various settlers leases to occupy portions of the Allegany Reservation in Salamanca, New York. The Supreme Court of New York, however, declared the leases void based upon 25 U.S.C. § 177, which prohibited SNI from leasing tribal lands without congressional authority. Congress remedied the problem by enacting the Act of February 19, 1875, ch. 90, 18 Stat. 330 (hereinafter "Act of 1875"). The Act of 1875 validated the existing leases and granted SNI the necessary authority to further lease the reservation land.

The Act of 1875 provided lessees with an option to renew the lease for a period "not exceeding twelve years" at terms and conditions "as may be agreed upon" by the lessees and SNI. In the event that the parties could not agree on the terms, the Act of 1875 required the parties to choose a referee or third person to "fix and determine the terms of said lease" and to render an award which would be "final and binding upon the parties." The Act of 1875 further provided that "whenever any lease shall expire after its renewal as aforesaid, it may, at the option of the lessee ... be renewed in the manner hereinbefore provided."

Congress later enacted the Act of September 30, 1891, ch. 1132, 26 Stat. 588 (hereinafter "Act of 1890"), which extended the renewal period from twelve years to "a term not exceeding ninety-nine years" and reaffirmed all other provisions of the Act of 1875.

In accordance with the Act of 1875 and Act of 1890, plaintiffs' predecessors renewed their leases in 1880 (for a period of twelve years) and again in 1892 (for a period of ninety-nine years). These leases were set to expire on February 19, 1991.

Under the terms of the leases, resident lessees paid SNI little or no money for the use of the land. SNI, perceiving gross inequity, asserted claims for back rent and threatened litigation against the resident lessees, the City of Salamanca, the State of New York, and the United States. As the February 1991 lease expiration date approached, the parties became concerned that SNI would not renew the leases and that SNI would, indeed, pursue litigation to recover payments for nearly one-hundred years of rental inequity.

To forestall litigation, the City of Salamanca created the Salamanca Indian Lease Authority ("SILA") to encourage SNI to offer new leases. SILA obtained authorization from plaintiff lessees to negotiate the terms of a new lease. Then, in 1990, SILA entered into an agreement with SNI ("Agreement"). The Agreement provided that the United States and the State of New York would pay a sum of money to SNI to remedy past economic inequities. In return, SNI would offer plaintiffs forty-year leases, renewable for another forty years, at fair market rental value ("40/40 leases"). Since the government's allocation of funding was a condition precedent to SNI's obligation to offer new leases, Congress enacted the Act of 1990 which authorized the necessary payment to SNI. After receiving payment, SNI offered plaintiffs new leases as agreed.

Some plaintiffs initially rejected the 40/40 leases and withdrew authorization previously granted SILA to negotiate leases on their behalf. SILA responded that it had already exercised its authorization insofar as negotiations had concluded and culminated in the

Agreement. These plaintiffs then demanded that SNI provide them with new ninety-nine year leases at terms to be negotiated via arbitration. SNI rejected plaintiffs' demand. When the ninety-nine year leases expired in February 1991, plaintiffs who refused to enter into the new 40/40 leases were ejected from the land via court order.

## II. Litigation

### A. Phase I: 1st USDC Order, Circuit Decision, and 2nd USDC Order

In 1990, plaintiffs brought a class action suit against SNI and others in the United States District Court for the Western District of New York. Plaintiffs sought to invalidate the Agreement and the Act of 1990 and to compel SNI to renew plaintiffs' leases at terms other than those offered in the 40/40 leases. As its first cause of action, plaintiffs requested a declaration that they possessed property rights to renew the leases via arbitration and property rights to own the improvements on the land. Plaintiffs argued that such property rights were granted by the Act of 1875, Act of 1890, and prior leases. The court dismissed the first cause of action pursuant to Rule 19 of the Federal Rules of Civil Procedure. The court reasoned that SNI was an indispensable party to such a determination of property rights—a fact that plaintiffs conceded at oral argument—but that SNI had to be dismissed from the suit on sovereign immunity grounds. In SNI's absence, the court held, it could not grant the requested relief. *See Fluent v. Salamanca Indian Lease Authority*, Civ. 90–1229A (Slip Opinion, Jan. 25, 1991) (hereinafter "1st USDC Order").

Plaintiffs appealed the 1st USDC Order to the Second Circuit Court of Appeals. Plaintiffs again argued that they possessed property rights to both renew the leases via arbitration and own the improvements on the land. Plaintiffs argued that SNI's sovereign immunity was impliedly waived by the prior leases and the Acts of 1875 and 1890; therefore, the lower court erred in dismissing the first cause of action. The Second Circuit disagreed and affirmed the lower court's order on two grounds: (1) SNI did not waive its sovereign immunity and, therefore, Rule 19 barred relief; and (2) even if Rule 19 did not bar relief, neither the prior Acts nor the prior leases gave plaintiffs continued or perpetual property rights. The requirements of the Act of 1875, Act of 1890, and leases had been fully satisfied by past leasehold renewals or by the 40/40 leases; plaintiffs were entitled to nothing more. *See Fluent v. Salamanca Indian Lease Authority*, 928 F.2d 542, 546–47 (2d Cir.), *cert. denied*, 502 U.S. 818, 112 S.Ct. 74, 116 L.Ed.2d 48 (1991) (hereinafter "Circuit Decision").

The case was then remanded to the district court for further proceedings against the remaining defendants, who filed a motion for summary judgment on the remaining claims that had not been disposed of in the 1st USDC Order. In supplemental submissions and at oral argument, plaintiffs raised several new claims that did not appear in the original pleadings. As the basis for these new claims, plaintiffs once again asserted that they possessed both property rights to renew the leases via arbitration and property rights to own the improvements on the land. Plaintiffs again argued that they were granted such rights by the Acts of 1875 and 1890, the prior leases, and now the Act of 1990 as well as the state and federal constitutions. After careful consideration of plaintiffs' arguments, the court unambiguously held that no such statutory, contractual, or constitutional property rights existed. More precisely, the court held that neither the Acts of 1875, 1890, or 1990, nor the prior leases, nor the state or federal constitutions granted plaintiffs a right to further negotiate or arbitrate new leases or to own the improvements on the land. *Fluent v. Salamanca Indian Lease Authority*, 847 F.Supp. 1046, 1057–1059 (W.D.N.Y.1994) (hereinafter "2nd USDC Order").

Plaintiffs did not appeal the 2nd USDC Order and thus the case was closed.

### B. Phase II: Ejectment Action

Despite their unsuccessful litigation attempts in Phase I, some individuals still refused to execute new leases and also refused to vacate the land when their leases expired. This forced the United States, on behalf of

SNI, to bring an ejectment action in the United States District Court for the Western District of New York. The lessee defendants raised the following defenses to that action: (1) the United States lacked authority to sue on behalf of SNI; (2) SNI was an indispensable party to the action which, under Rule 19, required that the action be dismissed; (3) the United States was judicially estopped from denying that SNI was an indispensable party based upon SNI's argument to that effect in Phase I of the litigation; (4) SNI did not own a fee interest in the land; and (5) disputed facts existed over whether the lessees possessed property rights to renew the leases or own improvements on the land. The court rejected each and every one of the lessees' defenses for the following reasons.[1]

First, the court held, the United States possessed statutory authority to bring the ejectment action on behalf of SNI. Second, Rule 19 was inoperative in the ejectment action because SNI's interest was adequately represented by the United States. By contrast, SNI's interest was not adequately represented in Phase I. Consequently, in Phase I, Rule 19 precluded relief. Third, judicial estoppel was inapplicable to the ejectment action because the doctrine does not prevent differing legal positions (as was the case here), only differing factual ones. Fourth, SNI owned the land in fee. Fifth, and finally, there were no disputed material facts over whether the lessees possessed either renewal rights to the leases or ownership rights to the improvements. The court reviewed the prior district and appellate courts' holdings and found these holdings to be determinative of the parties' rights. Nevertheless, the court pronounced, once again, that the individual leaseholders had no constitutional, statutory, or contractual rights to negotiate or to arbitrate renewal of their leases or to own improvements on the land. *See United States v. Fluent*, 95–CV–356A(H) (Slip Opinion, July 9, 1996) (hereinafter "Ejectment Action").

Plaintiffs did not appeal the Ejectment Action.

## C. Phase III: Court of Federal Claims Litigation

Having failed to establish or enforce property rights in either Phase I or II of earlier litigation, plaintiffs brought suit in the Court of Federal Claims. Here again, plaintiffs assert that they possess property rights to renew the leases via arbitration as well as property rights to own the improvements on the land. Plaintiffs argue that the Act of 1990 extinguished their renewal and arbitration rights and unlawfully transferred their interest in the leasehold improvements to SNI. This, plaintiffs contend, gives rise to their Fifth Amendment takings and due process claims.

## III. The Act of 1990

The key provisions of the Act of 1990 are set forth below:

§ 1774(b) **Purpose**

It is the purpose of this subchapter

(1) to effectuate and support the Agreement ... and facilitate the negotiation of new leases ... ;

(2) to assist in resolving the past inequities involving the 1890 leases and to secure fair and equitable compensation for the Seneca Nation ... ;

(8) to avoid the potential legal liability on the part of the United States ....

....

§ 1774b **New leases and extinguishment of claims**

(a) **New leases**

If the Seneca Nation offers new leases in accordance with the Agreement ....

(b) **Extinguishment of claims**

The Seneca Nation shall execute appropriate documents relinquishing all claims against the United States, the State, the city, the congressional villages, and all prior lessees for payment of annual rents prior to February 20, 1991, with respect to all prior and existing leases.

....

---

1. Prior to issuing its order, the court held a settlement conference with SNI and defendant lessees in an attempt, one last time, to facilitate settlement of the lease dispute. The parties, however, could not reach a settlement agreement.

**§ 1774c Responsibilities and restrictions**

**(a) Seneca Nation**

The Congress finds that the Seneca Nation is solely responsible for negotiation of the leases under the Agreement in its own interest and approval of any such lease by the United States is not required.

**(b) Lessees**

The Congress finds that—

(1) the lessees of leases with the Seneca Nation are responsible for representing their own interest in lease negotiations with the Seneca Nation; and

(2) nothing in this subchapter shall be construed to prevent the lessees from collectively negotiating with the Seneca Nation regarding such leases, whether through informal groups or as delegations formally sanctioned by either the State or local governments.

**(c) United States**

(1) The United States shall not serve in a capacity to approve leases of the Seneca Nation.

25 U.S.C. §§ 1774–74h (1994).

## DISCUSSION

In the instant case, plaintiffs fall into two groups: (1) those individuals who refused to sign new 40/40 leases and were later ejected from the land; and (2) those individuals and SCOUT, a corporate lessee, who executed new 40/40 leases and thus retained possession of the land and its improvements. To date, neither group has been certified as a class pursuant to RCFC 23.[2] Each plaintiff asserts a due process and takings claim in this court.

## I. Motion to Dismiss (Jurisdiction)

In considering defendant's motion to dismiss, the court must construe the facts in the complaint in the light most favorable to

plaintiff, *see Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), accept any undisputed allegations of fact as true, *see Reynolds v. Army and Air Force Exch. Serv.,* 846 F.2d 746, 747 (Fed.Cir.1988), and decide only those disputed facts pertaining to jurisdiction, *see id.* It is plaintiffs' burden to prove jurisdiction by a preponderance of the evidence. *See id.* at 748; *Burgess v. United States,* 20 Cl.Ct. 701, 703 (1990). Plaintiffs in this case aver jurisdiction under the Tucker Act.

The Tucker Act grants the Court of Federal Claims jurisdiction to hear non-tort money claims against the United States founded on the Constitution, federal statute or regulation, or contract. *See* 28 U.S.C. § 1491 (1994); *New York Life Ins. Co. v. United States,* 118 F.3d 1553, 1555 (Fed.Cir. 1997), *cert. denied,* — U.S. ——, 118 S.Ct. 1559, 140 L.Ed.2d 792 (1998). Not every constitutional claim, however, is jurisdictionally sound; the constitutional provision must mandate money payment to the plaintiff for the wrong alleged. *See United States v. Mitchell,* 463 U.S. 206, 216–17, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983); *New York Life Ins. Co.,* 118 F.3d at 1556. It is well settled that the Due Process Clause of the Fifth Amendment to the United States Constitution does not provide for money payment, and thus the Court of Federal Claims lacks jurisdiction to hear plaintiffs' due process claims. *See Crocker v. United States,* 125 F.3d 1475, 1476 (Fed.Cir.1997); *Wheeler v. United States,* 11 F.3d 156, 159 (Fed.Cir. 1993); *Murray v. United States,* 817 F.2d 1580, 1583 (Fed.Cir.1987). In contrast, the Takings Clause satisfies the Tucker Act's money-mandating requirement because it requires payment of "just compensation." *See Murray,* 817 F.2d at 1583. The Court of Federal Claims, therefore, retains jurisdiction to hear plaintiffs' takings claims. *See id.* For these reasons, the court dismisses plaintiffs' due process claims for lack of jurisdiction, but further considers plaintiffs' takings

---

**2.** On September 4, 1997, the court denied plaintiffs' motion for class certification, but on October 14, 1997, plaintiffs filed a motion of reconsideration. Plaintiffs' motion for reconsideration

is currently pending, but stayed while the court considers the within summary judgment motions.

claims and the parties' summary judgment arguments below.

## II. Cross–Motions for Summary Judgment [3]

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See* RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue of material fact is one that is outcome determinative; that is, it would change the outcome of the litigation. *See Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. Disputes over facts that are not outcome determinative do not prohibit the court from granting summary judgment relief. *See id.*

When the parties have filed cross-motions for summary judgment, as in the case here, the court must evaluate each party's motion on its own merits, separate and independent of the other, and resolve all reasonable inferences against the party whose motion is under consideration. *See Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987). The moving party of each motion must first show entitlement to judgment as a matter of law, and then the burden shifts to the non-moving party to establish the existence of a genuine issue of material fact for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Neither party may discharge its burden by cryptic, conclusory, or generalized responses. *See Tunnell v. Wiley*, 514 F.2d 971, 976 (3d Cir.1975); *see also Willetts v. Ford Motor Co.*, 583 F.2d 852, 856 (6th Cir. 1978).

### A. Property Rights

■ In determining whether a taking occurred, the court must consider: (1) whether plaintiffs possessed a compensable property interest; and (2) whether the government action constituted a taking of that interest.

*See Applegate v. United States*, 35 Fed.Cl. 406, 413 (1996). Plaintiffs' ownership of a property interest is key; because without a property interest, there can be no taking. *See id.* at 420; *see also Banner v. United States*, 38 Fed.Cl. 700, 703 (1997). Here, plaintiffs claim to possess two property rights: (1) the right to renew the prior leases via arbitration; and (2) the right to own the improvements on the land.

This is plaintiffs' fifth attempt to establish property rights, the first four attempts having occurred in Phases I and II of this litigation. In those phases, the United States District Court and the Second Circuit Court of Appeals repeatedly analyzed whether plaintiffs possessed property rights by way of statute, contract, or constitution and determined, unequivocally, that plaintiffs did not. Plaintiffs contend that this court should ignore those decisions since collateral estoppel and res judicata do not apply to this case. Defendant does not respond to plaintiffs' argument, but instead argues that the law espoused in the earlier phases is correct and, therefore, urges this court to follow it.

■ Contrary to plaintiffs' argument, collateral estoppel does apply, at least to the Ejectment Action, and bars those plaintiffs who did not execute 40/40 leases from relitigating the property rights issue in this court. Under the doctrine of collateral estoppel, or issue preclusion, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). The elements of collateral estoppel require that:

(1) the issues to be concluded are identical to those involved in the prior action; (2) in that action the issues were raised and actually litigated; (3) the determination of those issues in the prior action was necessary and essential to the resulting judg-

---

**3.** Because the parties submit evidence beyond the pleadings, the court considers defendant's motion to dismiss plaintiffs' takings claims as a motion for summary judgment brought under RCFC 56 and not one brought under RCFC 12(b)(4) for failure to state a claim upon which relief can be granted. *See* RCFC 56.

ment; and (4) the party precluded was fully represented in the prior action.

*Mother's Restaurant, Inc. v. Mama's Pizza, Inc.,* 723 F.2d 1566, 1569 (Fed.Cir.1983).

■ The issue here—whether the two asserted property rights exist—is identical to the issue raised in the Ejectment Action; the operative facts and controlling legal principles are identical in both cases. The issue was actually litigated; plaintiffs raised it as a defense to ejectment and argued the issue before the court. *See* Restatement (Second) of Judgments § 27 cmt. d (1982) (actual litigation does not require a trial on the issue, only that plaintiffs had an opportunity to present their argument (as in a summary judgment proceeding, for example)). The court's determination that plaintiffs did not possess property rights was necessary and essential to an order of ejectment; plaintiffs could not have been ejected if they possessed a lawful leasehold interest in the land and/or its improvements. The lessees who did not execute 40/40 leases were fully represented in the Ejectment Action; they had a strong interest in strenuously arguing the existence of property rights (to prevent ejectment) and were given a full and fair opportunity to argue the merits of that issue. All of the elements of collateral estoppel have been met.

Plaintiffs contend that the Ejectment Action holding is based upon earlier dicta contained in the Circuit Decision and thus cannot be given preclusive effect. Plaintiffs are wrong. The Ejectment Action, as did the 2nd USDC Order, treated the Circuit Decision as binding precedent. Even if mistaken, collateral estoppel nonetheless applies. *See Montana,* 440 U.S. at 162, 99 S.Ct. 970 ("[a] right distinctly adjudged in the original action cannot be disputed in a subsequent action, even though the determination was reached upon an erroneous view or by an erroneous application of the law") (quoting *United States v. Moser,* 266 U.S. 236, 242, 45 S.Ct. 66, 69 L.Ed. 262 (1924)); *General Motors Corp., Frigidaire Division v. United States,* 142 Ct.Cl. 878, 147 F.Supp. 739, 744 (1957) (Littleton, J., concurring-in-part and dissenting-in-part). The situations which prevent application of collateral estoppel—

e.g., when material changes have occurred in the facts or law, unfair procedures have been followed in the earlier action, or injustice would befall the precluded party—have not happened here. *See Montana,* 440 U.S. at 158–64, 99 S.Ct. 970; Restatement (Second) of Judgments § 28 (1982). Therefore, the court must invoke collateral estoppel in this case. To do otherwise "would substantially frustrate the doctrine's purpose of protecting litigants from burdensome relitigation and of promoting judicial economy." *United States v. Stauffer Chemical Co.,* 464 U.S. 165, 172, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984); *see Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979).

■ The court notes, however, that plaintiffs who executed the 40/40 leases were not parties to the Ejectment Action (Phase II), nor represented in that action. As to them, the Ejection Action does not trigger collateral estoppel. That does not mean that preclusive doctrines do not apply. For example, the 2nd USDC Order, and even the Circuit Decision for that matter, could arguably preclude these plaintiffs from relitigating the property rights issue. The court, however, need not invoke collateral estoppel to determine that plaintiffs who executed new leases do not have property rights. Rather, the court makes such a finding because it agrees with the United States District Court and Second Circuit Court of Appeals and their repeated analysis of the property rights issue in Phases I and II of the litigation. The holdings are clear and the reasoning of the courts is persuasive, sound, thorough, and complete. For this reason, this court adopts the law of Phases I and II of the litigation and, once again, it holds that plaintiffs—both those that executed the 40/40 leases and those that did not—do not possess compensable property rights to either renew the leases or own the improvements on the land.

Accordingly, because none of the plaintiffs in this case possess compensable property interests, all of their takings claims necessarily fail.

Notwithstanding, even if plaintiffs possessed the property rights asserted, the Act did not take those asserted rights. The Act of 1990 did not interfere with, transfer, or

eliminate leasehold renewal or ownership rights. It merely allocated funding to SNI so that SNI would offer new leases and release its claims against lessees for back rent. If anything, plaintiffs were benefitted, not harmed, by the Act and the releases obtained as a result. In short, nothing in the Act of 1990 can even remotely be construed as a taking of plaintiffs' property.

Plaintiffs argue that by facilitating the Agreement and the offering of 40/40 leases, the Act of 1990 weakened plaintiffs' individual bargaining positions with SNI. This, however, cannot provide the basis for relief. Plaintiffs' bargaining power is not a property interest and cannot give rise to a takings claim. See Applegate, 35 Fed.Cl. at 420 (mere expectancy is not a compensable property interest); Kearney & Trecker Corp. v. United States, 231 Ct.Cl. 571, 576, 688 F.2d 780 (1982) ("frustration of the plaintiff's 'expectations' is not compensable"). Plaintiffs' belief that arbitration may have yielded a better deal is, therefore, not compensable.

Moreover, failed negotiations with SNI have nothing to do with the Act of 1990 or the United States. The Act did not prevent plaintiffs from negotiating with SNI or entering into new lease agreements with SNI. The United States did not approve the leases or participate in the negotiations thereof. In fact, the Act of 1990 expressly stated that all lease negotiations were left to SNI and the individual lessees, leaving it up to the lessees whether to negotiate individually or in groups. If plaintiffs were unable to convince SNI to offer more favorable lease terms, their complaint is against SNI, not the United States. The Act of 1990 cannot be blamed.

Finally, plaintiffs who voluntarily entered into the 40/40 leases have not been dispossessed of or denied the property rights asserted. Since plaintiffs agreed to the terms of the new 40/40 leases, they retained possession of both the land and its improvements. Also, by executing the new leases, plaintiffs could not invoke arbitration rights, even if such rights existed. To the extent that these plaintiffs contend that the Act of 1990 strips them of future arbitration rights, future occupancy rights, and/or future ownership rights to the improvements, plaintiffs claims are not grounded in fact, but speculation. When their leases come up for renewal, plaintiffs may again successfully renegotiate the terms of their leases with SNI; or perhaps not. The mere possibility, however, that plaintiffs may be denied some property right in the future is not compensable. See Maritrans Inc. v. United States, 43 Fed.Cl. 86, 91 (1999) (the law does not provide compensation for future takings, only for those that have already occurred). Here, because plaintiffs have not now lost, and may never lose, the property rights asserted, they cannot be compensated for a takings claim in this court.

As to plaintiffs who were ejected from the land, they cannot maintain a takings claim against the United States for the government's conduct arising out of the ejectment action. Plaintiffs were unlawfully on the land; and the United States, on behalf of SNI, had every right to seek ejectment. See Ejectment Action, supra, at 6–11. Any forfeiture of possession, occupancy, or rights to the land and its improvements is due to plaintiffs' own failure to execute new leases, not due to the Act of 1990.

For all of these reasons, plaintiffs, as a matter of law, cannot prevail on their takings claims. Therefore, this court allows defendant's motion for summary judgment and denies plaintiffs' cross-motion for summary judgment.

## III. Motions to Strike

Both plaintiffs and defendant move to strike declarations, either in whole or in part, on the grounds that the affiant's testimony and attachments thereto do not satisfy the requirements of RCFC 56(f) and Appendix H. The court, however, need not reach the merits of these motions. The objectionable declarations and attached documents set forth historical background in this case and establish facts that are not in dispute. The declarations were not considered by the court when deciding the legal issues raised in the cross-motions for summary judgment. Indeed, the motions to strike are now moot. Accordingly, the motions are denied.

## CONCLUSION

For the reasons stated above, plaintiffs' due process claims fail for lack of jurisdiction, plaintiffs' takings claims fail for lack of a compensable property interest, and the parties' cross-motions to strike are deemed moot. Therefore, the court orders that:

1. defendant's motion to dismiss plaintiffs' due process claims for lack of jurisdiction (filed on April 21, 1998, and corrected copy filed on December 4, 1998) is *ALLOWED;*

2. defendant's motion for summary judgment on plaintiffs' takings claims (filed on April 21, 1998, and corrected copy filed on December 4, 1998) is *ALLOWED;*

3. plaintiffs' cross-motion for summary judgment on plaintiffs' takings claims (filed on November 6, 1998, and corrected copy filed on November 9, 1998) is *DENIED;* and

4. plaintiffs' motion to strike the declaration of William A. Morgan (filed on November 6, 1998, and corrected copy filed on November 9, 1998) and defendant's cross-motion to strike, in part, the declaration of Jennifer A. Coleman (filed on March 31, 1999) are *DENIED.*

In light of the court's decision, plaintiffs' motion for reconsideration of class certification (filed on October 14, 1997), which is currently stayed, is *DENIED* as moot.

**IT IS SO ORDERED.**