**Don and Gayle APPLEGATE, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 92–832L.

United States Court of Federal Claims.

April 26, 1996.

Gordon H. Harris, Melbourne, FL, for plaintiffs. Jack A. Kirschenbaum and J. Mason Williams, Gray, Harris, Robinson, Kirschenbaum & Peeples, of counsel.

Lewis S. Wiener, Washington, DC, with whom was Assistant Attorney General Lois J. Schiffer, for defendant.

## OPINION

MILLER, Judge.

This case is before the court on plaintiffs' motion for summary judgment as to liability; plaintiffs' motion for partial summary judgment based on the Assignment of Claims Act, 31 U.S.C. § 3727 (1994); and defendant's motion for summary judgment. Plaintiffs seek compensation for an alleged taking in violation of the Fifth Amendment through erosion due to construction of a federal harbor project. By their motions plaintiffs contend: 1) that erosion of their properties above the mean high-water mark, beyond the limits of the Federal Government's navigational servitude, amounts to a physical taking; 2) that the Government caused the erosion of their properties through construction of the Canaveral Harbor project; and 3) that they can recover compensation, under the Assignment of Claims Act, for damages that may have occurred prior to their ownership of each individual parcel of land. Defendant asserts entitlement to summary judgment on the bases: 1) that plaintiffs have no compensable expectancy in accreting beaches or in the uninterrupted flow of sand; 2) that plaintiffs cannot claim compensation for movement of a state-established regulatory line; and 3) that plaintiffs have no property right in lands seaward of state-established erosion control lines. This opinion also addresses plaintiffs' motion to strike affidavits, filed contemporaneously with plaintiffs' response and reply to defendant's response and cross-motion for summary judgment.

An order entered on October 4, 1995, indicated that argument would be scheduled. However, review of the prolix filings reveals disputed factual issues on the central question of causation and none concerning the state-established regulatory line and the Assignment of Claims Act, the latter two issues involving straightforward case law, so that argument will not aid resolution of these matters.

## FACTS

The following facts are undisputed, unless otherwise indicated. This constitutional takings case involves over 300 plaintiffs and more than 350 parcels of land. Plaintiffs allege that actions by the United States, acting through the Army Corps of Engineers (the "Corps"), caused flooding and beach erosion on their properties such that compensation is required under the Fifth Amendment's takings clause. The court previously established a protocol, allowing plaintiffs Don and Gayle Applegate and Noro and Company, d/b/a Pelican Landing Resort, to represent the claims of the other plaintiffs. *Applegate v. United States,* No. 92–832L (Fed.

Cl. June 23, 1995).[1] The court has also bifurcated proceedings on liability and damages. *Applegate v. United States,* No. 92–832L (Fed.Cl. Feb. 27, 1995).

Plaintiffs are owners of beachfront property south of Port Canaveral in Brevard County, Florida. This coastline fronts on the Atlantic Ocean to the south of the projection of Cape Canaveral. Prior to the events giving rise to this action, the area consisted of a 41–mile long arc of white sandy beaches. All of the plaintiffs, save one, acquired interests in the properties that are the subject of this action at various times after construction began on the federal project in question.

During the 1950s the Corps undertook construction of the Canaveral Harbor Project (the "Project") as authorized by the Rivers and Harbors Act of 1945, Pub.L. No. 79–14, §§ 1–2, 59 Stat. 10, 16 (1945) (partially codified at 33 U.S.C. § 603a (1994)). The Project was designed to provide a deep-water harbor on the east coast of Florida in Brevard County, immediately south of Cape Canaveral. The Project included the dredging of a channel from the deep water of the Atlantic Ocean through a barrier island into the Banana River Lagoon, as well as turning basins, dikes, locks, and other harbor mechanisms. Construction of the Project began in 1950.

As part of the Project, the Corps constructed two jetties projecting from the shoreline eastward into the Atlantic Ocean. By November 1953 approximately 813 feet, out of 1,100 feet, of the south jetty had been completed, along with 445 feet of revetment that was placed along the south bank of the land cut beginning at the shore end of the south jetty. In February 1954 construction began on a 300–foot extension to the south jetty, and a 1,200–foot revetment to be added to the landward end of the earlier south bank

revetment. The Corps completed this work in September 1954, along with construction of the north jetty which commenced on February 15, 1954. Plaintiffs and defendant contest the purpose of the jetties and their effect on the harbor and adjacent lands.

One of the disputes in this case is the extent to which the jetties interrupt the natural southerly littoral flow of sand.[2] The parties present starkly different scenarios, through exhibits, affidavits, studies, and other documents, regarding the effect of the Project on sand flow and, consequently, on plaintiffs' properties. According to plaintiffs, the jetties and periodic dredging of the channel have blocked the flow of sand. Plaintiffs argue that, but for the Project, this sand would deposit on plaintiffs' properties south of Canaveral Harbor. Defendant counters that any analysis of shore erosion must begin with beach creation, dating from the Mesozoic Era, which reveals that the beaches were not created by the littoral flow of sand, as well as the effect of more recent events, such as massive coastal storms.

In an attempt to mitigate erosion, Congress authorized construction of a fixed trestle, mechanical sand bypass system to, among other things, transfer sand from beaches north of the Canaveral navigational channel to beaches south of the channel. Rivers and Harbor Act of 1962, Pub.L. No. 87–874, § 101, 76 Stat. 1173, 1174 (1962). The sand bypass system was let out for bids, but construction of the project was delayed indefinitely in 1971. The principal reason for delay is disputed. Plaintiffs argue that the project was postponed due to potential legal liability, while defendant asserts that it was not operationally practicable. To date the Corps has not built a sand transfer facility.

---

1. The trial protocol allows plaintiffs Don and Gayle Applegate and Noro and Company, d/b/a Pelican Landing Resort, to stand as test cases to be tried on the issue of whether a compensable taking has occurred, including the nature and extent of any taking for which the Government is required to pay just compensation. The test plaintiffs are to resolve the following representative issues in this case, among others: 1) residential property; 2) ownership; 3) close proximity to Port Canaveral; 4) significant westward movement of the mean high-water mark, dune de-

struction, and actual property destruction due to actions by the Federal Government; 5) effect of coastal construction control lines; 6) total loss of property value; 7) environmental damage; and 8) mitigation of damages through beach restoration programs.

2. A littoral flow of sand is a "river" of sand which flows parallel to the coastline between the high and low tide water lines.

Congress also authorized a shore protection project for the Brevard County beaches. Rivers and Harbor Act of 1968, Pub.L. No. 90–483, § 102, 82 Stat. 731, 732 (1968). The project segments at Canaveral Beach and Indiatlantic/Melbourne Beach, all in Brevard County, involved the transfer of sand and were constructed in 1975 and 1981, respectively. Since 1972 the Corps has undertaken other maintenance projects for the beaches south of the Canaveral navigational channel by placing nearly 6 million cubic yards of beach quality sand directly on the beaches and in the nearshore littoral zone south of Canaveral Harbor. Such efforts included projects in 1972, 1974, 1980, 1992, 1993, 1994, and 1995. The effect of the shore projects on plaintiffs' properties is in dispute.

Plaintiffs claim that, as a result of construction of the Project, the mean high-water mark ("MHWM") has moved westward, thus flooding their properties. The parties contest the actual position of the MHWM between particular survey boundaries. Indeed, whether the MHWM moved at all, and, if so, the causes of such movement, is the subject of extensive proposed findings by the parties.

In 1970 the Florida Legislature adopted sections 161.141 and 161.191 of the Shores and Beach Preservation Act, Fla.Stat.Ann. §§ 161.01–18 (West.1995) (renamed the "Beach and Shore Preservation Act" in 1990) (the "Act"), which permitted the establishment of Erosion Control Lines ("ECL") in conjunction with certain beach restoration, beach renourishment, and erosion control projects. An ECL fixes the boundary between sovereignty lands of the State bordering, in this case, on the Atlantic Ocean and private upland property adjacent to those lands. On January 28, 1974, the first ECL for Brevard County was established. The first Brevard County ECL begins at the south jetty of Port Canaveral at Permanent Reference Monument ("PRM") 1 and extends south to approximately Arthur Avenue, just south of PRM 13.

In 1971 the Florida Legislature adopted section 161.053 of the Act authorizing establishment of coastal construction control lines ("CCCL") on a state-wide, county-by-county basis along State beaches fronting on the Atlantic Ocean, the Gulf of Mexico, and the Straits of Florida. Pursuant to Florida law, CCCLs are established after a public hearing. Upon establishment, CCCLs are recorded in the public records of each county in which the lines are located. Since CCCLs are established to prevent development, the placement of the lines, and the causes for any movement of the lines, inevitably impact plaintiffs' beachfront properties.

On March 21, 1975, the first CCCL was recorded in Brevard County following public hearings. The second Brevard County CCCL, which is located west of the first CCCL, was recorded on December 4, 1986, following public hearings. Since 1982 other CCCLs throughout the State also have moved landward, through the CCCL re-establishment process. While the movement of CCCLs is not in dispute, the parties disagree about the underlying causes for movement of the Brevard County CCCLs. Plaintiffs contend that the project caused the movement.

On December 4, 1992, plaintiffs filed suit based on defendant's alleged taking of their property without just compensation and asked for an injunctive order requiring the Corps to build the previously-authorized sand transfer plant. The court granted defendant's motion to dismiss based on lack of jurisdiction to provide injunctive relief and on the bar of the six-year statute of limitations. The Federal Circuit reversed and remanded as to the second ground. *See Applegate v. United States,* 28 Fed.Cl. 554 (1993), *rev'd in part,* 25 F.3d 1579 (Fed.Cir.1994). Plaintiffs move for summary judgment on liability and partial summary judgment based on the Assignment of Claims Act; defendant seeks summary judgment complete.

## DISCUSSION

1. *Summary judgment standards; takings*

■ Summary judgment is appropriate when no genuine issues of material fact are in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c). Only disputes over material facts, or facts that might significantly affect the outcome of the suit under the governing law, preclude an

entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). For example, "an evidentiary conflict created on the record ... by a knowledgeable affiant" raises a question of material fact. *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.,* 731 F.2d 831, 836 (Fed.Cir.1984); *accord First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968). It is the availability of a proper fact question resolvable by a jury that determines the appropriateness of summary judgment. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970)).

▪ Both plaintiffs and defendant, as the moving parties, have the burden of establishing that no genuine disputes of material fact are present and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "[S]ummary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constr., Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir. 1987) (citations omitted). Thus, cross-motions for summary judgment do not require the court to grant judgment in favor of either party.

▪ Summary judgment is appropriate to isolate and dispose of factually unsupported claims or defenses, *Celotex,* 477 U.S. at 323–24, 106 S.Ct. at 2552–53, and is suitable in takings cases. *See, e.g., Allied–General Nuclear Serv. v. United States,* 839 F.2d 1572, 1578 (Fed.Cir.) (affirming summary judgment of takings claim), *cert. denied,* 488 U.S. 819, 109 S.Ct. 61, 102 L.Ed.2d 39 (1988). Although the "fact-intensive" nature of a takings case can be a basis for denying summary judgment, *Yuba Goldfields, Inc. v. United States,* 723 F.2d 884, 887 (Fed.Cir. 1983), summary judgment properly can intercede and prevent trial if the movant can demonstrate that trial would be useless in that more evidence than is already available in connection with its motion could not reasonably be expected to change the result. *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.,* 739 F.2d 624, 626 (Fed.Cir.1984). Summary judgment in such cases, including takings cases, presents a salutary method of disposition designed " 'to secure [a] just, speedy and inexpensive determination.' " *Celotex* 477 U.S. at 327, 106 S.Ct. at 2554 (quoting Fed. R.Civ.P. 1); *accord Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.,* 833 F.2d 1560, 1563 (Fed.Cir.1987).

Even if disposition by summary judgment is favored, however, a court commits reversible error by resolving conflicts in evidence on a motion for summary judgment that might affect the outcome of a suit. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. In ruling on the parties' motions, the court therefore cannot weigh the evidence and determine the truth of the matter. *Id.* at 249, 255, 106 S.Ct. at 2510, 2513.

2. *Permanent physical occupation; taking through erosion*

▪ In order to state a claim for a taking under the Fifth Amendment's just compensation clause, a claimant must establish that he was the owner of property and that some portion of the property was taken for a public purpose. *Public Water Supply District No. 3 v. United States,* 133 Ct.Cl. 348, 352, 135 F.Supp. 887, 890 (1955). Whether the claimant alleges that the Government took his property by physically invading it or by regulating the property to an extent that amounts to a taking of its use, the party must first establish a compensable property interest. *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1027, 112 S.Ct. 2886, 2899, 120 L.Ed.2d 798 (1992) (regulatory taking); *Kaiser Aetna v. United States,* 444 U.S. 164, 179–80, 100 S.Ct. 383, 392–93, 62 L.Ed.2d 332 (1979) (taking by physical invasion); *Skip Kirchdorfer, Inc. v. United States,* 6 F.3d 1573, 1580–82 (Fed.Cir. 1993) (regulatory and physical taking). The Supreme Court has recognized both physical occupation and regulatory action as requiring compensation under the Constitution. *Loret-*

to v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 426, 102 S.Ct. 3164, 3171, 73 L.Ed.2d 868 (1982). In a physical takings case, the inquiry is limited to whether the claimant can establish a physical occupation, not necessarily of infinite duration, of his property by the Government. *Loretto,* 458 U.S. at 441, 102 S.Ct. at 3179. The physical occupation need not occur directly, but can be found in a physical injury to real property substantially contributed to by a public improvement. *United States v. Kansas City Life Ins. Co.,* 339 U.S. 799, 809–10, 70 S.Ct. 885, 890–91, 94 L.Ed. 1277 (1950). In a regulatory takings case, the claimant must prove an unjustified interference with a property interest held at the time of obtaining title to the property. *Lucas,* 505 U.S. at 1027, 1031, 112 S.Ct. at 2899, 2901. No dispute is present that plaintiffs in this case have a compensable property interest in their ownership of parcels of land.

Plaintiffs claim a physical invasion of their properties through flooding and erosion caused by the Corps' construction of the Project. They contend that the construction interfered with the natural southerly littoral flow of sand that, before construction of the Project, provided regular, natural replenishment and maintenance of their beachfront properties. Defendant maintains that plaintiffs have no compensable expectancy in the littoral flow of sand because the Government has exceptional power to regulate waters in the public interest, including the flow of sand beneath the MHWM. Defendant further argues that plaintiffs knew that their properties were eroding at the time of purchase and consequently have no claim for replacement of sand. Moreover, plaintiffs purchased their properties with a regulatory scheme, *i.e.* the Project, already in place.

 It is well settled that flooding and attendant erosion of private property by the Government amount to a taking. *United States v. Dickinson,* 331 U.S. 745, 750, 67 S.Ct. 1382, 1385, 91 L.Ed. 1789 (1947) ("When it [the Government] takes property by flooding, it takes the land which it permanently floods as well as that which inevitably washes away as a result of that flooding."); *accord Owen v. United States,* 851 F.2d 1404,

1414 (Fed.Cir.1988). Such erosion amounts to a physical taking. *Owen,* 851 F.2d at 1409, 1413. Further, "the actual [Governmental] construction ... need not directly encroach upon the property in question before a taking by the government can be deemed to have occurred." *Id.* at 1411–12. "[I]t is not the location of the cause of the damage that is relevant, but the location and permanence of the effect of the government action causing damage that is the proper focus of the taking analysis." *Id.* at 1412 (emphasis omitted) (citing *Tri–State Materials Corp. v. United States,* 213 Ct.Cl. 1, 7, 550 F.2d 1, 4 (1977)). Accordingly, the inquiry in this case explores not the actual building of the Project, but, rather, the resulting effect on plaintiffs' properties.

 Takings cases involving navigable waters present unique considerations. The United States holds broad powers to regulate along bodies of water and maintains an exclusive navigation servitude, *United States v. Rands,* 389 U.S. 121, 123, 88 S.Ct. 265, 266, 19 L.Ed.2d 329 (1967), which reflects the superior interests of the United States in navigation and the nation's navigable waters. *United States v. Twin City Power Co.,* 350 U.S. 222, 224, 76 S.Ct. 259, 260, 100 L.Ed. 240 (1956). In light of the dominant interest in preserving the public right of navigation, the authority of the Government over navigable waters is "supreme." *Confederated Tribes of Colville Reservation v. United States,* 964 F.2d 1102, 1108 (Fed.Cir.1992) (citing *Gordon v. United States,* 211 Ct.Cl. 310, 311, 546 F.2d 430, 1976 WL 23897 (1976), *cert. denied,* 430 U.S. 930, 97 S.Ct. 1549, 51 L.Ed.2d 774 (1977)); *Goose Creek Hunting Club, Inc. v. United States,* 207 Ct.Cl. 323, 330–31, 518 F.2d 579, 583 (1975). The navigational servitude defines the appropriate boundaries wherein the Government can assert its power to supersede private ownership interests without creating an obligation to pay just compensation under the Constitution. *Owen,* 851 F.2d at 1408.

The holdings of the Supreme Court and the Federal Circuit establish that the Government owes no compensation for injury or destruction of a claimant's rights when they lie within the scope of the navigational servi-

tude, which encompasses, at least, properties below the MHWM. *See, e.g., United States v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co.,* 312 U.S. 592, 596–97, 61 S.Ct. 772, 775, 85 L.Ed. 1064 (1941) (finding no compensation for railway embankments located between mean high- and low-water marks); *Owen,* 851 F.2d at 1411–12 (finding no taking for damage to interests below mean high-water mark). However, the Supreme Court "has never held that the navigational servitude creates a blanket exception to the Takings Clause. . . ." *Kaiser–Aetna,* 444 U.S. at 172, 100 S.Ct. at 389.

The Federal Circuit recognizes that compensation may be required "where improvements to navigation made by the government result in erosion to land located above or outside . . . the high-water mark at the time of construction." *Owen,* 851 F.2d at 1412 (emphasis omitted). Significantly, *Owen* overruled in part *Pitman v. United States,* 198 Ct.Cl. 82, 457 F.2d 975 (1972), *overruled by Owen,* 851 F.2d at 1413, a suit also grounded on alleged damage caused by construction of the Project. The Court of Claims in *Pitman* denied recovery based on the broad navigational servitude held by the United States. *Pitman,* 198 Ct.Cl. at 86–87, 457 F.2d at 977. The Federal Circuit in *Owen* stated:

> Although the Court of Claims in *Pitman* was not incorrect . . . to reject recovery since the shoreland sand was present solely due to the uninterrupted "flow" of the ocean, . . . the court improperly extended that same logic to prevent compensation for erosion loss of land located above the ocean's high-water mark.

*Owen,* 851 F.2d at 1413 (citations omitted). Whether the Government's action went so far as to amount to a taking then is a separate inquiry from the existence of the navigational servitude itself. *Kaiser–Aetna,* 444 U.S. at 174, 100 S.Ct. at 390; *Owen,* 851 F.2d at 1416.

Nevertheless, defendant argues that individual plaintiffs who purchased their properties after construction of the Project lack a compensable expectancy in the uninterrupted southerly littoral flow of sand. Defendant's arguments are based on the pre-sumably perceptible, on-going state of erosion of which, according to defendant, the affected plaintiffs should have been aware at the time of purchase. This argument, however, is rooted in a regulatory takings theory, rather than physical occupation through erosion and flooding. While a landowner does assume ownership of property subject to the regulatory scheme that is in place at the time of taking title, *Lucas,* 505 U.S. at 1027–28, 112 S.Ct. at 2899, this rule is not applicable to a taking by physical invasion. *Id.* at 1028, 112 S.Ct. at 2899. The Fifth Amendment's takings clause does not permit the Government to continually erode private property, or flood such property, and avoid compensation for actual loss because of intervening transfer of title. *See, e.g., Dickinson,* 331 U.S. at 747–49, 67 S.Ct. at 1384–85 (allowing claim by owner who acquired interest after gradual takings events commenced); *Applegate,* 25 F.3d at 1583 (finding statute of limitations no bar to current owners' present compensation claims due to gradual taking). The Supreme Court's recognition in *Lucas* of the federal navigational servitude as a preexisting scheme that limits title, 505 U.S. at 1029, 112 S.Ct. at 2900, is not analogous to ongoing, government-caused erosion and flooding. Plaintiffs do not maintain that compensation is owed for lands subject to the navigational servitude. Instead, they seek redress for ongoing damages allegedly caused by construction of the Project. Those damages are physical in nature and subject to an analysis distinct from the "expectancy" standards of *Lucas.*

Binding precedent supports a ruling, as a matter of law, that flooding and erosion on plaintiffs' properties caused by governmental action above the MHWM is a compensable taking. *Owen,* 851 F.2d at 1416. The same line of cases denies compensation to a landowner for damage to property within the broad navigational servitude held by the United States, specifically the littoral flow of sand below the MHWM.

A judgment as a matter of fact and law in a takings case requires proof of causation. Proof of actual and proximate causation of plaintiffs' damages due to construction of the Project by the Corps is a difficult

undertaking on summary judgment. Takings cases prevent development of " 'any "set formula" for determining when "justice and fairness" require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons.' " *Kaiser–Aetna,* 444 U.S. at 175, 100 S.Ct. at 390 (quoting *Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978)). Takings inquiries are often decided on the basis of distinct, factual issues, *Kaiser–Aetna,* 444 U.S. at 175, 100 S.Ct. at 390, "and erosion issues are inherently factual." *Owen,* 851 F.2d at 1416 (citing *Loesch v. United States,* 227 Ct.Cl. 34, 43, 645 F.2d 905, 913, *cert. denied,* 454 U.S. 1099, 102 S.Ct. 672, 70 L.Ed.2d 640 (1981)). Such is the case in this matter where a distinct factual inquiry is the only means to resolve the controversy.

### 1) *Proof of loss*

 Fundamental to proving causation in a takings case is marshalling evidence of the actual taking of property. *Public Water,* 133 Ct.Cl. at 352, 135 F.Supp. at 890. Plaintiffs filed their complaint in 1992. The intervening years have involved a successful motion to dismiss by defendant on statute of limitations grounds, which was reversed in part on appeal. *Applegate v. United States,* 28 Fed.Cl. 554 (1993), *rev'd in part,* 25 F.3d. 1579 (Fed.Cir.1994). After remand a protocol was established, at the urging of plaintiffs, for the purpose of facilitating a more manageable trial. *Applegate v. United States,* No. 92–832L (Fed.Cl. June 23, 1995). Plaintiffs Don and Gayle Applegate and Noro and Company, d/b/a Pelican Landing Resort, were permitted to represent the claims of similarly situated plaintiffs. Plaintiffs' counsel certified to the court that the test plaintiffs represent the similar claims of all plaintiffs. During the following months, the court ordered plaintiffs to provide defendant with information on the actual and specific physi-

cal losses due to dune and bluff erosion caused by construction of the Project. To date plaintiffs have not provided any information on actual loss of property for any plaintiff, including the test plaintiffs.[3] As a result, plaintiffs currently face a June 28, 1996 deadline to provide such information, after which the sanction of dismissal will be imposed. *Applegate v. United States,* 35 Fed.Cl. 47, 58–59 (1996) (order denying motion to dismiss and compelling discovery); *Applegate v. United States,* No. 92–832L (Fed.Cl. Mar. 27, 1996) (order denying reconsideration and extending deadline).

The June 28, 1996 deadline does not affect the disposition of plaintiffs' motions. Plaintiffs did not seek additional time to augment the record with proof of actual losses to their properties. Indeed, when plaintiffs filed their summary judgment motions on July 27, 1995, they had been ordered to produce this information. An order entered on August 18, 1995, merely confirmed the previous instructions and deferred briefing on plaintiffs' motions until they complied with the court's order to provide defendant with answers to outstanding discovery requests by November 30, 1995. *Applegate v. United States,* No. 92–832L (Fed.Cl. Aug. 18, 1995) (order granting motion to compel). This deferral order had two objectives: 1) It operated as a sanction, *i.e.,* plaintiffs could not ignore the court order while asking the court to advance the case, and 2) it recognized that plaintiffs' motion as to liability could not be granted without proof as to actual losses. Plaintiffs failed to comply with the order as of December 1995, so the court reinstated the briefing on January 2, 1996. *Applegate v. United States,* No. 92–832L (Fed.Cl. Jan. 2, 1996). This later order had one objective: It removed a feckless sanction. After defendant moved to dismiss the complaint for failure to comply with the August 18, 1995 order, the court denied the motion, but afforded plaintiffs one final opportunity to comply. *Applegate,* 35 Fed.Cl. at 57–61. The impending

---

**3.** On November 20, 1995, plaintiffs filed a notice of compliance with the court's orders on defendant's discovery requests regarding actual and specific property losses for each plaintiff. Plaintiffs' filing contained a chart enlarging elaborate formulae applied by an expert to calculate so-

phisticated estimates of loss for each plaintiff, but did not contain any actual allegations of loss for any individual plaintiff. *See Applegate v. United States,* 35 Fed.Cl. 47, 54 (1996) (order denying motion to dismiss and compelling discovery).

June 28, 1996 deadline thus has no bearing on plaintiffs' motions for summary judgment. Plaintiffs have had an extended period of time within which to brief their motion on liability in any manner they saw fit; briefing is now closed.

Although the protocol may resolve issues identical to all plaintiffs, its establishment in no way obviated any plaintiff's obligation to prove the essential elements of a takings claim plaintiff by plaintiff, including causation and loss. The existence of multiple plaintiffs with similar claims does not alter the applicable legal burdens, including proof of loss and causation. Evidence of a taking of one property does not, absent additional proof, support a finding of taking of other properties. *See, e.g., Jensen v. United States,* 158 Ct.Cl. 333, 336–37, 305 F.2d 444, 445–46 (1962) (allowing certain takings claims based on individualized, adequate proof); *Adaman Mut. Water Co. v. United States,* 143 Ct.Cl. 921, 924–26, 181 F.Supp. 658, 659–61 (1958) (same). Without an appropriate showing of the amount of beachfront allegedly lost, the court cannot rule as a matter of fact and law that any loss occurred—assuming that such allegations of loss are uncontroverted—and that any plaintiff in this case therefore is entitled to compensation for a taking of property.

### 2) *Proof of causation*

 To entitle a claimant to compensation, the Fifth Amendment requires that the Government actually take the property interest at issue. In cases involving indirect action, a necessary and difficult element of proof is causation. Collectively, plaintiffs and defendant have presented hundreds of pages of documents. Review of the evidence submitted on summary judgment leads to the ineluctable conclusion that the burdens attendant to resolution on summary judgment as to causation, in light of the conflicting evidence, are insurmountable. The evidence presents conflicting scenarios regarding the causes, history, and current state of erosion on beaches south of Canaveral Harbor.

Among the disputes that directly relate to causation is the nature of beach creation and renourishment. Plaintiffs assert that Brevard County beaches are the product of the natural southerly littoral flow of sand, which also causes sustaining accretion, relying on letters from Corps engineers, Corps reports, and the holding in *Pitman.* 457 F.2d at 978. Disputing plaintiffs' theory that the littoral flow of sand created the beaches, defendant rejoins with an alternative explanation of the process by which the beaches of Peninsular Florida were formed, relying on the Affidavit of David V. Schmidt, Chief, Coastal Section, Plan Formulation Branch, Planning Division, Jacksonville District, U.S. Army Corps of Engineers.

Regarding the Project's effect on the littoral flow of sand and plaintiffs' burden of proof of causation, plaintiffs argue that Corps documents show that the Project has blocked, or intercepted, some 15.4 million cubic yards of sand between 1952 and 1995 or 1996. *See* Affidavit of Michael P. Walther, Mar. 1, 1996, ¶ 8 (independent estimates based on a study). The Schmidt Affidavit, offered by defendant for similar purposes, concludes that the Canaveral navigational channel intercepted 5.6 million cubic yards of material between 1972 and 1995, but the Corps has placed approximately 6 million cubic yards of beach quality sand as renourishment in order to achieve relative stability. Affidavit of David V. Schmidt, Feb. 1, 1996, ¶¶ 20–21. Indeed, the relative stability of the beaches is the subject of counterpoint evidence. Plaintiffs cite to 40 years of Corps studies, letters from responsible officials, and several affidavits (Mr. Walther's being the only relevant one), while defendant primarily relies on the expertise and opinion of Mr. Schmidt. In a 28–page factual analysis contained in their reply to just one of defendant's genuine issues,[4] plaintiffs attempt to refute defendant's showing by extrapolating and reconciling data from these documents and then calculating the unreplenished net loss based thereon.

---

4. Defendant is correct that RCFC 56(d)(2) does not contemplate a reply to an opponent's statement of genuine issues. The court has decided

to consider this material. Notwithstanding that decision, this added material has multiplied the record and contributed to its complexity.

Plaintiffs also attempt to show that the blockage of sand flow by the jetties extends far enough south so as to encompass each individual plaintiff's property. Plaintiffs rely in part on memoranda from Corps engineers, a letter to a United States Representative, and a letter by an acting regional director of the Department of the Interior. Although admitting that each of the communications issued, defendant argues that no evidence has been shown of any relationship between the information in the communications regarding erosion and damage incurred by any individual plaintiff, or of any relationship at all between construction of the Project and plaintiffs' individual damages.

Plaintiffs rely heavily on Corps documents generated over the last half century. The documents include statements, many from the 1950s and 60s, that lend support to plaintiffs' argument that construction of the jetties for the Project and the Corps periodic dredging of the channel ultimately impacted plaintiffs' properties and caused erosion. However, as defendant points out, these documents do not address the issue of what caused the erosion to plaintiffs' specific properties or which and to what extent individual properties were affected. Even admissions by Corps officials of the general effect of the Project on Brevard County beaches do not establish Fifth Amendment takings liability with respect to any individual plaintiff absent evidence of causation and actual loss. Thus, plaintiffs' contention that incriminating statements in Corps documents amount to admissions by the Corps of liability to individual plaintiffs is incorrect.

Regarding the current state of erosion, the parties offer conflicting evidence as to the source of such erosion; whether the beaches currently may be stable; and whether certain documents, if any, conclusively establish causation between current erosion and construction of the Project. Plaintiffs allege the Corps' March 1992 Reconnaissance Report "admits to 1.5 million dollars in *annual* losses to property extending 22.2 miles south of Port Canaveral as a result of beach erosion." Plfs' New Proposed Finding of Fact No. 28, filed Jan. 23, 1996. Defendant responds that the Report makes no conclusions; it is a preliminary study based on past data to determine the necessity of any further study. According to defendant, "the Report analyzed then existing erosion, regardless of cause, and made recommendations regarding potential solutions to the same." Def's Statement of Genuine Issues No. 28, filed Feb. 2, 1996. Defendant adds that although the Corps' Report does not attribute the cause of erosion to the Project, it does recognize erosion caused by storms.

The preceding examples reveal that the issue of causation, central to this takings claim, inescapably involves complex, detailed scientific and other evidence that is not appropriate for evaluation on summary judgment. RCFC 56(c) allows disposition on summary judgment if the pleadings "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Plaintiffs sought judgment for liability for losses due to construction of the Project. While binding precedent supports plaintiffs' theory that erosion above the MHWM caused by a government construction project constitutes a taking, the court can only credit plaintiffs' evidence by weighing it against defendant's. This the court cannot do on summary judgment. Not only does a ruling that the Government is liable for a taking require a showing of causation, but a *prima facie* case also requires a showing of actual loss. Plaintiffs have made neither showing on summary judgment and thus have not met their burden. Although plaintiffs are not entitled to summary judgment on liability, those plaintiffs who have complied with the outstanding orders requiring them to provide information on the amount of loss sustained to their individual property will be allowed to present evidence of causation and actual loss at trial.

### 3. *Assignment of claims*

■ Plaintiffs argue that a landowner may recover damages for a taking of property that precedes his ownership of the affected property. Plaintiffs assert that they are entitled to compensation dating back to the initial construction of the Project, regardless of the date of purchase, because the alleged

taking became permanent only after their ownership commenced. They rely upon *Dickinson,* 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789, and *Cooper v. United States,* 827 F.2d 762 (Fed.Cir.1987), urging that a party's claim should not be dismissed where the Government's taking of property began before the party acquired the property, but stabilized after purchase. Contending that the taking of their property had not stabilized at the time of purchase, because of the gradual process of beach erosion, plaintiffs maintain that they may recover for any taking that anteceded their ownership because they, not their predecessors, bear the risk of permanent loss. Rejecting the proposition that plaintiffs can recover for loss that antecedes their ownership, defendant argues that owning property on the date of the alleged taking constitutes a necessary element in a takings lawsuit and reasons that all plaintiffs are foreclosed, by case law and statute, from claiming any damages prior to their purchases.

 When the Government takes an individual's private property for public use, the Fifth Amendment ensures that the individual receives just compensation. U.S. Const. amend. V. However, "[f]or the reason that compensation is due at the time of taking, the owner at that time, not the owner at an earlier or later date, receives the payment." *Danforth v. United States,* 308 U.S. 271, 284, 60 S.Ct. 231, 236, 84 L.Ed. 240 (1939). "The person entitled to compensation for a taking of property by the Government is the owner of the property at the time of the taking." *Lacey v. United States,* 219 Ct.Cl. 551, 560, 595 F.2d 614, 619 (1979) (per curiam); *accord United States v. Dow,* 357 U.S. 17, 20–21, 78 S.Ct. 1039, 1043–44, 2 L.Ed.2d 1109 (1958); *Danforth,* 308 U.S. at 284, 60 S.Ct. at 236; *see, e.g., Creppel v. United States,* 33 Fed.Cl. 590, 600 (1995); *Cavin v. United States,* 19 Cl.Ct. 190, 197 n. 4 (1989) (finding no standing to assert takings claim unless party "owned the property at the time of the alleged taking"), *aff'd in part, rev'd in part,* 956 F.2d 1131 (Fed.Cir.1992).

The case law of primary importance to this case is found in *Dow* and *Danforth.* "[I]t is undisputed that '[since] compensation is due at the time of taking, the owner at that time, not the owner at an earlier or later date, receives the payment.'" *Dow,* 357 U.S. at 20–21, 78 S.Ct. at 1043–44 (quoting *Danforth,* 308 U.S. at 284, 60 S.Ct. at 236). Furthermore, "[i]t is well established ... that the Assignment of Claims Act prohibits the voluntary assignment of a compensation claim against the Government for the taking of property." *Id.* at 20, 78 S.Ct. at 1043 (citing *United States v. Shannon,* 342 U.S. 288, 72 S.Ct. 281, 96 L.Ed. 321 (1952)).

In their Motion for Partial Summary Judgment as to the Assignment of Claims Act, 31 U.S.C. § 3727 (1994), plaintiffs confuse the distinct issues of the date of takings for statute of limitations purposes and claims prior to ownership. The Federal Circuit held that, for purposes of the jurisdictional statute of limitations, plaintiffs in this case need not have initiated suit prematurely in a piecemeal fashion. The limitations period commenced when the damage became so definite as to have stabilized. Stabilization, according to the appellate court, did not occur beyond the limitations period, *i.e.,* before 1986. *Applegate,* 25 F.3d at 1581–84. Thus, plaintiffs' claims are not time-barred. That opinion, however, did not mandate, either implicitly or explicitly, that uncertainty as to the date of taking affected the legal interests held by plaintiffs for purposes of assignment of claims. It is axiomatic that a party must hold a compensable property interest to recover compensation for a taking. *Lucas,* 505 U.S. at 1027, 112 S.Ct. at 2899 (regulatory taking); *Kaiser–Aetna,* 444 U.S. at 179–80, 100 S.Ct. at 392–93 (taking by physical invasion).

Plaintiffs' reliance on *Dickinson* and *Cooper* is misplaced. Both cases stand for the proposition that a statute of limitations may not bar a claim based on a taking that was not completed until after the party owned the property, not, as plaintiffs assert, that a claimant may recover compensation for a taking effected prior to ownership. *Dickinson* is a seminal case on the statute of limitations and gradual takings; it does not address the ability of a claimant to recover for damages pre-dating ownership. The Supreme Court's ruling was confined to the

legal principle that "when the Government chooses not to condemn land but to bring about a taking by a continuing process of physical events, the owner is not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really 'taken.'" *Dickinson,* 331 U.S. at 749, 67 S.Ct. at 1385. *Dow* characterized *Dickinson,* as follows:

> The expressly limited holding in *Dickinson* was that the statute of limitations did not bar an action under the Tucker Act for a taking by flooding when it was uncertain at what stage in the flooding operation the land had become appropriated to public use.

357 U.S. at 27, 78 S.Ct. at 1047. It was the effect of a gradual taking on the statute of limitations for which the Federal Circuit cited *Dickinson.* *Applegate,* 25 F.3d at 1582. *Cooper* similarly involved a gradual flooding of plaintiff's property. 827 F.2d at 762. Adhering to *Dickinson,* the Federal Circuit ruled in *Cooper* that since the taking did not sufficiently stabilize until after plaintiff owned the property, the statute of limitations did not preclude plaintiff from recovering compensation for the destruction of the timber in which he had a property interest. *Id.* at 764. The court ruled that plaintiff was entitled to compensation because he "had a property interest in the timber when the taking of the timber became complete." *Id.*

■ Plaintiffs misconstrue precisely this point. Neither *Dickinson* nor *Cooper* established that a claimant may recover damages for a taking of property that occurred prior to his ownership. In fact, in *Dickinson,* the Supreme Court observed that if the taking began long before purchase, plaintiff's "claim would be barred because he acquired the land after that date." *Dickinson,* 331 U.S. at 747, 67 S.Ct. at 1384. Ownership of a property interest is an essential element in a takings claim. A property interest is grounded in a legally enforceable right, not an expectancy. *See, e.g., United States v. Petty Motor Co.,* 327 U.S. 372, 380 n. 9, 66 S.Ct. 596, 600 n. 9, 90 L.Ed. 729 (1946) (finding no property right in expectation that lease would be renewed); *Deltona Corp. v. United States,* 228 Ct.Cl. 476, 491, 657 F.2d 1184, 1193 (1981) (holding that mere expectancy is not property), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982).

■ It is uncontroverted that all plaintiffs, with the exception of one, purchased their properties after construction began on the Project. As binding case law instructs, a party may only receive compensation under the Fifth Amendment for the taking of a property interest. No claimant may ever claim compensation for an interest which he does not own. Accordingly, plaintiffs' claims for damages that antecede individual ownership are barred, absent a valid assignment of a previous owner's claim under the Assignment of Claims Act.

■ Plaintiffs' claims of property loss prior to ownership are not grounded in law; they are appeals to equity, which is beyond the court's jurisdiction. While the exact dates of the alleged takings may be uncertain due to the gradual erosion of the beaches, the nature of the damages that plaintiffs are entitled to recover is clear. For example, plaintiffs are not entitled to compensation for a mere expectancy, such as construction of a sand transfer plant. *See Deltona,* 228 Ct.Cl. at 491, 657 F.2d at 1193 (mere expectancy is not property). Plaintiffs are, however, entitled to recover for damage to their properties, which logically only can commence when plaintiffs own the properties, not before.

Arguing that a party may only recover compensation for a taking of property at the time of ownership, defendant takes the position that plaintiffs can claim property taken prior to ownership only if a valid assignment of the claim occurred under the Assignment of Claims Act. Plaintiffs rejoin that the Act does not apply to this case and thus is no bar to their claims. They assert that applicability of the Act depends upon the existence of an assignable claim. Because of the ongoing nature of the taking, plaintiffs argue, no claim accrued sufficiently to the point where it could be ascertained and consequently assigned at the time each plaintiff acquired his property interest.

■ Under the Assignment of Claims Act, "an assignment [of a claim against the United States] may be made only after a

claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued." The statute protects the Government by disallowing the assignment of contingent claims and "enable[s] the Government to deal only with the original claimant." *United States v. Aetna Casualty & Sur. Co.*, 338 U.S. 366, 373, 70 S.Ct. 207, 211, 94 L.Ed. 171 (1949) (citing *Goodman v. Niblack*, 102 U.S. 556, 560, 26 L.Ed. 229 (1880), and *Spofford v. Kirk*, 97 U.S. 484, 490, 24 L.Ed. 1032 (1878)). In keeping with this purpose, the Act "prohibits the voluntary assignment of a compensation claim against the Government for the taking of property." *Dow*, 357 U.S. at 20, 78 S.Ct. at 1043 (citing *Shannon*, 342 U.S. 288, 72 S.Ct. 281, 96 L.Ed. 321). In effect, then, the Act precludes "successors-in-interest to individuals who would have been valid plaintiffs" from bringing compensation claims for takings, unless a valid, not voluntary, assignment under the Act occurred. *Creppel*, 33 Fed.Cl. at 599 n. 10 (citing *Dow*, 357 U.S. at 20, 78 S.Ct. at 1043).

Plaintiffs must demonstrate that a valid assignment of a takings claim has taken place, thereby allowing them to recover damages for the period preceding their ownership of the property at issue. In attempting to argue that the Assignment of Claims Act does not apply to their action, plaintiffs contend that "no [p]laintiff is suing upon an assignment in this action." Plfs' Br. filed Mar. 5, 1996, at 18. Plaintiffs' admission substantiates a finding for defendant as to this fact. Since plaintiffs are barred by law from claiming damages prior to ownership, and no valid assignment has occurred, plaintiffs are precluded from recovering damages for any property taken before the date of purchase for each affected property.

Plaintiffs attempt to avoid the consequence of the law by arguing that the indefinite nature of the permanent damage which impacted the statute of limitations analysis similarly impacts their ability to claim compensation for damages prior to ownership. Plaintiffs state:

[I]t is the present property owners alone who bear the risk that all prior losses will become permanent. It is they alone who

may have to make assessments, either privately or publicly, to remedy the situation. It is they alone who will suffer the ongoing process of erosion.... Therefore, the Plaintiffs cannot be barred by the Assignment of Claims Act from maintaining their causes of action to recover all losses to their properties.

Plfs' Br. filed July 27, 1995, at 2. This analysis confuses the nature of the Federal Circuit's ruling in this case. The appeals court did not allow the case to move forward on a theory of past damage, but on present, ongoing damage to plaintiffs' properties. The Federal Circuit issued a narrow ruling addressing the statute of limitations, not a pronouncement on the existence of prior claims. Due to the lack of valid claims and attendant assignment under the Act, defendant's motion for summary judgment as to the Assignment of Claims Act is granted, and plaintiffs' motion for summary judgment is denied as to this ground.

### 4. *Coastal construction control lines*

Defendant has cross-moved for judgment as a matter of law on plaintiffs' allegation that defendant is liable for unspecified damages incurred by plaintiffs as a consequence of the State of Florida's establishment and later movement of the Brevard County CCCL. Defendant also argues that CCCLs were established on a statewide basis, unrelated to any erosion caused by construction of the Project, and that many plaintiffs are time-barred from asserting a claim on this ground due to the applicable statute of limitations. Plaintiffs respond that the Government is liable for any increase in damages resulting from movement of the Brevard County CCCL caused by construction of the Project and that their claims are not time barred.

Plaintiffs' claim based on CCCLs involves a unique situation—action taken wholly by state authorities, with no apparent nexus to a federal program, but allegedly in reaction to an environmental situation caused by a federal construction project. Plaintiffs do not allege federal involvement in the planning or execution of the CCCLs. Rather, they contend that federal and state interaction is

irrelevant, since results are paramount over cause, *i.e.*, the movement of CCCLs flows directly from the Project.

It is essential to any takings claim against the United States that liability be dependant upon acts of the Federal Government. *Griggs v. Allegheny County,* 369 U.S. 84, 89, 82 S.Ct. 531, 533, 7 L.Ed.2d 585 (1962). Absent federal action or, at a minimum, federal interaction with state or local governments, a takings case must fail as a matter of law. *See, e.g., Blue v. United States,* 21 Cl.Ct. 359, 362–63 (1990) (finding no taking when county is free to reject advice of Navy); *Mesa Ranch Partnership v. United States,* 222 Ct.Cl. 623, 626, 650 F.2d 285, 1980 WL 99761 (1980) ("[A]cts of federal officials in persuading local officials to obstruct development by placing new burdens upon it, or refusing to lift old ones, are not takings imputable to the United States."). Liability of the United States for a taking therefore is dependent upon action by the Federal Government. *Lynch v. United States,* 221 Ct.Cl. 979, 981, 1979 WL 10424 (1979); *see also United Nuclear Corp. v. United States,* 912 F.2d 1432, 1435 (Fed.Cir. 1990). Furthermore, the regulatory action of local authorities may not be imputed to the Government in order to create liability for a taking. *De–Tom Enters., Inc. v. United States,* 213 Ct.Cl. 362, 364–65, 552 F.2d 337, 339 (1977). While state involvement in a federal regulatory program may require compensation as a taking, absent such a nexus the United States is not liable for state actions. *See Adolph v. FEMA,* 854 F.2d 732, 735–36 (5th Cir.1988) (finding no federal coercion such that takings claim would lie against Government where parish participated in voluntary federal program); *City Nat'l Bank v. United States,* 33 Fed.Cl. 759, 762–64 (1995).

No evidence has been presented of any interaction between state and federal authorities such that distinct state action can be imputed to the Federal Government as a taking requiring compensation. Plaintiffs do allege that construction of the Project caused substantial erosion and that, in response, the state adopted CCCLs, thereby preventing development. However, plaintiffs have sub-

mitted no evidence of direct interaction between the state and the Federal Government in the establishment of the lines. Arguments of counsel cannot establish a genuine issue of material fact. *See Levi Strauss & Co. v. Genesco, Inc.,* 742 F.2d 1401, 1404 (Fed.Cir. 1984). Plaintiffs present no indirect relationship beyond mere conjecture that CCCLs, which were established on a state-wide basis, were introduced in specific reaction to the Project. Plaintiff in *De–Tom* alleged that the Government wrongfully persuaded local officials to deny its zoning application. 213 Ct.Cl. at 364–65, 552 F.2d at 339. The Court of Claims held that the Government could not be liable for a regulatory taking unless its own regulatory activity was so extensive as to amount to a taking. *Id.,* 552 F.2d at 339. As in *De–Tom* the evidence of record shows no direct contact between the Federal Government and state authorities. Absent direct interaction between state and federal authorities, with such action coming at the mandate of a federal program, liability for state actions cannot be imputed to the Government for a taking.

In order to avoid this line of cases, plaintiffs take the position that the basis for imputing liability is not the establishment of CCCLs, *per se,* but rather the detrimental landward location of the Brevard County CCCL that occurred due to erosion allegedly caused by the Project. Although plaintiffs find a direct relationship with legal consequences between the two activities, they cite no cases in support of their argument.

Plaintiffs' argument does raise an interesting question as to the interaction of federal and state environmental regulation and the takings clause. *See City Nat'l Bank,* 33 Fed. Cl. at 762–64. Nonetheless, the case law, precedential and persuasive, does not permit the court to impute a wholly voluntary act by the state to the Federal Government. No court has held that the Federal Government is liable for every state-initiated restraint on property that arises as a result of a positive action by the Federal Government. Such a rule would place an insurmountable financial burden on the Government as guarantor of state actions and is not within any reasonable interpretation of the Fifth Amendment's tak-

ings clause. In this case the state's establishment of CCCLs was entirely within the discretion and at the sole impetus of the state and are actions for which the Government is not liable.[5]

In their 76–page reply brief and opposition to defendant's cross-motion, plaintiffs cite no case law to support their theory of federal liability. Defendant has shown that no facts presented at trial would obviate the rule of law upon which defendant relies. Upon such a showing by defendant, plaintiffs must raise a genuine issue of material fact as to whether compensation for the movement of CCCLs is a federal responsibility. *Mesa Ranch,* 222 Ct.Cl. at 626; *De–Tom,* 213 Ct.Cl. at 364–65, 552 F.2d at 339. Plaintiffs have failed to discharge their burden. A complete failure of proof of an essential element of the non-moving party's case necessarily renders all other facts immaterial. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552. Such is the case that plaintiffs have presented on this issue, and, accordingly, judgment is entered for defendant on this ground.

5. *Erosion control lines*

■ Defendant argues that plaintiffs do not own portions of the properties allegedly taken by construction of the Project because the state-established ECL, enacted pursuant to the Shores and Beach Preservation Act, Fla.Stat.Ann. §§ 161.141, 161.191 (West 1995) (renamed the "Beach and Shore Preservation Act" in 1990), vests title to lands seaward of the lines in the state by right of its sovereignty. The ECLs were adopted as part of a larger effort to, among other things, protect the state's beaches from erosion caused by natural forces and human construction. Fla.Stat. § 161.191 provides, in pertinent part:

(1) ... [T]itle to all lands seaward of the erosion control line shall be deemed to be vested in the state by right of its sovereignty, and title to all lands landward of such line shall be vested in the riparian

upland owners whose lands either abut the erosion control line or would have abutted the line if it had been located directly on the line of mean high water on the date the board of trustees' survey was recorded.

(2) Once the erosion control line along any segment of the shoreline has been established ... the common law shall no longer operate to increase or decrease the proportions of any upland property lying landward of any such line, either by accretion or erosion or by any other natural or artificial process....

Thus, according to the terms of the statute, an ECL fixes the boundary between state and private land, and property owners who assert ownership to property located seaward of the ECL do not own such property. It is axiomatic that a claimant cannot assert a takings claim over property owned by a government, whether state, local, or federal.

Plaintiffs do not contest defendant's interpretation of the relevant statute. Plaintiffs instead argue that the MHWM has drifted westward of the ECL alternatively flooding their property, amounting to a temporary taking and causing erosion, a permanent taking.

Basic takings case law does not permit plaintiffs to press a claim over property which they do not own. At any point where the ECL falls west or landward of the MHWM, the State of Florida, not the individual plaintiff, owns the property east or seaward of the line. However, any movement of the MHWM caused by construction of the Project, which resulted in flooding or erosion on plaintiffs' properties, would amount to a temporary or permanent taking according to prevailing case law. The parties' contentions, therefore, are neither mutually exclusive nor contradictory.

6. *Motion to strike affidavits*

Plaintiffs' Motion To Strike Affidavits of David V. Schmidt, and Kirby B. Green, III,

---

5. In addition to arguing a lack of federal involvement in the state's movement of CCCLs, defendant also maintains that plaintiffs have failed to introduce any evidence of injury, have failed to counter defendant's supporting affidavits, and have not surmounted arguments that certain plaintiffs' claims are time barred and that many plaintiffs had no compensable expectancy at the time of purchase. In light of the court's ruling, defendant's additional arguments need not be addressed.

Deputy Secretary, Florida Department of Environmental Protection, was served on defendant on March 5, 1996, contemporaneously with their reply and opposition to defendant's cross-motion for partial summary judgment. Plaintiffs argue that the two affidavits contradict facts as reflected in defendant's own documents and therefore should be stricken under RCFC 56(f) and that the Green affidavit contains testimony beyond the scope of his expertise. In their final brief, plaintiffs also argue that the alleged contradictions indicate that the affidavits were submitted in bad faith and consequently sanctions should be awarded under RCFC 56(h).

Defendant answers that plaintiffs' motion is untimely; that contradictory statements in the affidavits relate to issues of the weight to be accorded evidence not its admissibility; and that the testimony in the Green affidavit is admissible as within his area of expertise.

RCFC 12(f) requires a party to move to strike prior to, as part of, or contemporaneously with the party's response. Plaintiffs' motion was included in a voluminous filing containing a dispositive motion, a lengthy appendix, and proposed findings. The entire package was received by the Clerk of the Court on March 5, 1996. Although most of the documents were filed by leave of the judge on March 5, 1996, the motion itself was not stamped "received" and subsequently filed by leave until March 7, 1996. The certificate of service enclosed with the motion indicates service on March 5, 1996. Accordingly, the motion will be considered as timely filed.

■ The manner in which plaintiffs present their arguments must be noted. Plaintiffs' initial brief contained no citations to legal authorities, statutory or case law, beyond the rules of the court. Following defendant's response and cross-motion, plaintiffs replied with more extensive arguments, substantiated with persuasive, but not binding, authorities, outside the scope of both their original brief and defendant's response. All of plaintiffs' citations in their reply could, and should, have been included in their original motion. On this basis alone, the court could deny plaintiffs' motion.

■ As to the substance of plaintiffs' motion, a reading of the two affidavits, in comparison with the evidence submitted with plaintiffs' motion, raises an inference of a pattern of contradictions. For example, the Schmidt affidavit states that no evidence exists to support plaintiffs' assertions that the past rate of accretion or advancement of the beach would have continued in the future. Corps' documents, cited by plaintiffs, present the opposite scenario. Plaintiffs also cite to contradictions between Mr. Green's testimony in his affidavit and Corps documents.

The testimony of both Messrs. Schmidt and Green is open to contradiction by documents presumably within their control and knowledge as responsible environmental officers. However, the contradictions are not of sufficient strength to require exclusion, but rather are open to reasonable interpretation such that they require explanation at trial. Nor do the contradictions rise to the egregious levels depicted in plaintiffs' citations. *See, e.g., Acrotube, Inc. v. J.K. Fin. Group, Inc.,* 653 F.Supp. 470, 478 (N.D.Ga.1987) (awarding sanctions for testimony "flatly at odds with facts indisputably" within affiant's knowledge); *Shatkin v. McDonnell Douglas Corp.,* 727 F.2d 202, 208 (2d Cir.1984) (upholding exclusion of testimony based on affiant's facially suspect assumptions).

The evidence presented by both parties is a voluminous compendium of studies and historical documents. The opposing conclusions that plaintiffs and defendant draw make reconciliation impossible on summary judgment and represent issues that trial alone can resolve. The court is unable to perform comparative, side-by-side analysis of the Schmidt and Green affidavits and plaintiffs' evidence without determining the weight to be accorded to the former. Ultimately, plaintiffs' arguments go to the weight and sufficiency of the affidavits, rather than their admissibility.

■ Plaintiffs' final argument relates to alleged legal conclusions reached by Mr. Green in his affidavit regarding the effect of the ECL and the CCCLs. Mr. Green is the Deputy Secretary of the Florida Department of Environmental Protection, a position that requires knowledge of the state's regulatory

processes. Plaintiffs' citations are correct in that "interpretation of statutes normally is a question of law, which does not require expert testimony." *American Nat'l Ins. Co. v. United States,* 231 Ct.Cl. 604, 621–22, 690 F.2d 878 (1982). Nevertheless, expert testimony reaching legal conclusions may be admissible "where the testimony concerns 'state law or a technical provision peculiar to the . . . industry.'" *Principal Mut. Life Ins. Co. v. United States,* 26 Cl.Ct. 616, 623 (1992), *aff'd,* 50 F.3d 1021 (Fed.Cir.1995) (quoting *Aetna Life Ins. Co. v. United States,* 16 Cl.Ct. 364, 365 (1989), *aff'd,* 935 F.2d 280, 1991 WL 72724 (Fed.Cir.1991)). Mr. Green's affidavit, to the extent it reaches legal conclusions, is admissible as within his area of expertise. Plaintiffs' motion to strike the Schmidt and Green affidavits is denied.

## CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED,** as follows:

1. Plaintiffs' motions for summary judgment are denied.

2. Defendant's motion for partial summary judgment is granted as to plaintiffs' claims based on the CCCL and the Assignment of Claims Act and is otherwise denied.

3. Plaintiffs' motion to strike is denied.

4. Assuming that plaintiffs comply with the court's order of February 29, 1996, requiring them to respond to outstanding discovery requests by June 28, 1996, a status conference shall be held at 2:00 p.m. on Monday, July 15, 1996, in the National Courts Building to schedule the dates for pretrial filings, the pretrial conference, and trial of the claims of all plaintiffs who have complied.